## GUARANTY TRUST CO. OF NEW YORK et al. v. UNION SOLVENTS CORPORATION.

### No. 802.

District Court, D. Delaware.

Dec. 29, 1931.

Merrell E. Clark and Maxwell Barus (of Fish, Richardson & Neave), and Philip C. Peck, all of New York City, and William G. Mahaffy, of Wilmington, Del., for plaintiffs.

M. K. Hobbs and George I. Haight (of Haight, Adcock & Banning), both of Chicago, Ill., and George F. Scull and Charles W. Mortimer (of Gifford, Scull & Burgess), both of New York City, and Charles F. Curley, of Wilmington, Del., for the defendant.

NIELDS, District Judge.

This is an infringement suit under United States patent No. 1,315,585, entitled "Production of Acetone and Alcohol by Bacteriological Processes," issued to Charles Weizmann September 9, 1919, upon an application filed December 26, 1916.

The first two plaintiffs, Guaranty Trust Company of New York and the Butacet Corporation, are the holders of the legal and equitable title of the patent. The term "plaintiff" as used in this opinion refers to the third plaintiff, the Commercial Solvents Corporation, a Maryland corporation, exclusive licensee under the patent. This company since 1920 has been operating the process described in the Weizmann patent, at Terre Haute, Ind., and Peoria, Ill., in the production of butyl alcohol and acetone, the principal products of that process. The defendant, Union Solvents Corporation, was recently incorporated and organized under the laws of Delaware. In 1930 it began commercial operations at its plant in Cincinnati, Ohio. It produces butyl alcohol and acetone and sells them in direct competition with the plaintiff.

The bill of complaint charges infringement and contains the customary prayers for relief. Defendant denies infringement and attacks the validity of the patent on five or more grounds, including lack of utility, lack of operability, indefiniteness, nonpatentable subject-matter, and the prior art.

The process of the Weizmann patent is a bacteriological fermentation process for the production of acetone and butyl alcohol. The principal use for butyl alcohol is as a solvent in the manufacture of nitrocellulose lacquers of the duco type, which are used extensively for finishing automobile bodies, furniture, and the like. The principal commercial use for acetone is as a solvent or absorbent in acetylene gas containers, in the manufacture of photographic films and of some types of artificial silk.

Dr. Charles Weizmann, the patentee, is an English biochemist and bacteriologist. Before the World War he had received training in the Pasteur Institute at Paris. During the war acetone was used extensively by the British government in the manufacture of an explosive called "cordite." A plant was installed at Kings Lynn in 1914 for the production of acetone by the bacteriological fermentation of starch from potatoes as the result of the work of a group of scientists. Production was not a commercial success and in March, 1916, the British government took possession of the works. Meanwhile, Dr. Weizmann having separated from the group of scientists devoted himself for two years to an intensive study of the subject. He applied for a patent for "Improvements in the Bacterial Fermentation of Carbohydrates and in Bacterial Cultures for the same," and in 1915 British patent No. 4845 was granted to him. Having learned of the Weizmann process, the British government decided to try it at Kings Lynn and Dr. Weizmann was placed in charge of the plant. Operations were highly successful. Large quantities of acetone and butyl alcohol were produced, although butyl alcohol was then regarded as a by-product. In the later years of the war England was short of food and required all of her own maize. Accordingly, the manufacture of acetone was shifted to Canada. In Canada the British government, under the name of British Acetones, Limited, operated the Weizmann process from August, 1916, until November, 1918, in a remodeled distillery, loaned and directed by Col. A. E. Gooderham. Here 6,000,000 pounds of acetone and about twice that amount of butyl alcohol were produced. After the United States entered the war, the British War Mission in this country incorporated a company in New York called Commercial Solvents Corporation for the purpose of operating the Weizmann process in our corn belt. A distillery was purchased at Terre Haute, Ind. It was remodeled and operated by an executive committee of the company consisting of Col. Gooderham, Robert D. Clarke, formerly an American distiller, and Joseph Banigan, a Canadian. Information necessary for the

construction and operation of the Terre Haute plant was obtained from the Canadian plant. The bacterial cultures necessary to inaugurate the Weizmann process at Terre Haute were also obtained from Canada.

Production of acetone and butyl alcohol began at Terre Haute in May, 1918. About that time the United States Signal Corps became interested in the Weizmann process as a source of acetone for the manufacture of airplane "dope." The Signal Corps purchased a half interest in the Commercial Solvents Corporation of New York. Thereupon, another distillery was purchased and equipped at Terre Haute for operating under the Weizmann process, known as plant No. 2, which went into production in July or August, 1918. The United States received one-half of the acetone produced and likewise one-half of the butyl alcohol. Both plants were shut down shortly after the Armistice, having produced 1,670,000 pounds of acetone and 2,900,000 pounds of butyl alcohol. Although butyl alcohol at that time was considered a by-product, 1,000,000 pounds were sold to lacquer manufacturers.

It is significant to note the officers of Commercial Solvents Corporation (N. Y.) operating the Weizmann process at Terre Haute during the war. Robert D. Clarke was general manager. Nathaniel Frutkow was chief bacteriologist at Plant No. 1. His training in the process was acquired in the course of a six-day visit to the British acetones plant in Canada before operations at Terre Haute were under way. Fred H. Carter, who had been assistant bacteriologist at the Canadian plant for two years, was chief bacteriologist at Plant No. 2. When plaintiff bought out this war company and succeeded to its Weizmann rights, Carter was continued as bacteriologist but Clarke and Frutkow were dropped. Within the last year or two defendant entered the field with Clarke as a director and Frutkow as vice president and bacteriologist, positions they still hold.

In December, 1916, Weizmann filed in the United States Patent Office his application for the patent in suit. In July, 1918, the application was found allowable by the Patent Office. It was withheld from issue, however, by order of the Commissioner of Patents because it had been found to contain "subject matter which might * * * assist the enemy in this present war." After the Armistice, this order was revoked and the patent issued in September, 1919. In the meantime, Commercial Solvents Corporation (N. Y.) had secured a formal exclusive license under the patent to be issued on the Weizmann application. In January, 1920, plaintiff Commercial Solvents Corporation (Md.) purchased the assets of the New York corporation and secured an assignment of the exclusive license, which was executed also by Dr. Weizmann. Under this license plaintiff has been operating ever since.

Butyl alcohol had never been produced in commercial quantities in this country until the war operations under the Weizmann process. Any demand for "higher" alcohols for the manufacture of lacquers was supplied by amyl alcohol, a by-product of the manufacture of spirits. This supply was threatened by Prohibition. Lacquer companies purchased substantial quantities of butyl alcohol during the war and it proved a satisfactory substitute for amyl alcohol. Under these circumstances plaintiff purchased the Terre Haute plants and embarked upon its operations under the Weizmann process, principally for the production of butyl alcohol. From 1920 to 1923 production was irregular. Thereafter there was an extraordinary increase from 7,500,000 pounds of solvents in 1923 to about 107,500,000 pounds in 1929. The increased demand necessitated the building of a large additional plant at Peoria and other facilities at the aggregate cost of $6,000,000 and the payment of large royalties to the patent owners.

█ The record shows that an important and extensive new industry has now been developed and established upon the Weizmann process. In England the monopoly of the Weizmann patent was acquiesced in until 1926, when Synthetic Products Company began the manufacture of acetone and butyl alcohol. In the litigation that immediately ensued the Weizmann patent was held valid and infringed. Commercial Solvents Corporation v. Synthetic Products Company, Ltd., Reports of Patent Design and Trademark Cases, vol. XLIII, No. 7, pp. 185, 238. In the decade from 1920 to 1929, plaintiff continued to be America's only manufacturer of normal butyl alcohol and its only manufacturer of butyl alcohol of any kind by a fermentation process until Robert D. Clarke, Nathaniel Frutkow, and their associates formed the defendant company and in 1930 entered the field as an active competitor of the plaintiff. If the validity of the patent were a matter of doubt, the scale would be turned in favor of the patent under the facts above recited. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 496, 23 L. Ed.

952; Auto Vacuum Freezer Co. v. William A. Sexton Co., 239 F. 898 (C. C. A. 2).

The Weizmann patent is for the fermentation of a mash of natural substances rich in starch, like corn mash, by means of bacteria which are identified in the specification of the patent by certain definite characteristics. "Fermentation" is the chemical change, or the decomposition into new chemical compounds, of a substratum, by living organisms, such, for example, as yeast or bacteria. "Starch" consists of carbon, hydrogen, and oxygen in certain proportions and is broken down by the particular bacteria of the patent into new compounds, such as butyl alcohol, acetone, and a small amount of ethyl alcohol and of acids, with the evolution of hydrogen gas and carbon dioxide gas. "Bacteria" are among the smallest and simplest forms of vegetable life having an average diameter of 1/25,000 of an inch. They multiply by dividing transversely in half. Bacteria may be divided into two classes, aerobic and anaerobic. Aerobic bacteria grow, multiply, and perform their functions best when free oxygen is present. The smallest trace of oxygen prevents the growth, multiplication, or functioning of anaerobic bacteria. When surrounding conditions become unfavorable to growth, bacteria pass into what may be called a hibernating stage and are called "spores" or "in spore form." They may continue in this state for a long time and will resist injurious influences such as excessive heat, cold, and chemicals. Under proper temperature with food present they will again come into the vegetative form and will grow, multiply, and carry on their life work.

Weizmann was not the first to produce acetone and butyl alcohol by a fermentation process. He made no such claim. Mere production of limited quantities of acetone and butyl alcohol by a fermentation process was not the problem with which Dr. Weizmann was dealing. The problem with which he was dealing and successfully solved was that of isolating a particular bacteria or a culture containing some particular bacteria that would produce butyl alcohol and acetone *in commercial quantities better than any other known bacteria.* Weizmann discovered a particular species of bacteria new to bacteriologists and invented the process of successfully employing them. This task called for the exercise of inventive genius. He obtained his patent, not for the bacteria per se, but for a process which consists in the employment of certain bacteria to produce large yields of acetone and butyl alcohol under aerobic or anaerobic conditions.

In his specification the patentee states: "I have found that certain heat-resisting bacteria, which are identified by the fact that they will convert the greater part of maize or other grain starch into acetone and butyl alcohol, and will also liquefy gelatin, can be used for the purpose of obtaining large yields of acetone and alcohols by the fermentation of solutions or suspensions of natural substances rich in starch or other carbohydrates mixed with such substances under aerobic or anaerobic conditions, i. e., with free access of air as in yeast fermentation, or without."

The patent contains three claims. Claims 1 and 3 are in suit. They read:

"1. The process of producing acetone and butyl alcohol by the fermentation of liquids containing natural substances rich in starch by means of the herein described bacteria which are capable unaided of converting sterile fermentable grain starch substantially into acetone and butyl alcohol, and also liquefying gelatin."

"3. The process of producing acetone and butyl alcohol by the inoculation of a cereal composition with the herein described bacteria which are capable unaided of converting sterile fermentable cereals substantially into acetone and butyl alcohol."

A description of the "herein described bacteria" of the claims is contained in the specification.

██ The defendant contends that the Weizmann patent fails to disclose adequate identifying characteristics of the bacteria and that the bacteria cannot be isolated by following the directions of the patent. An inventor pays for his patent by disclosing his invention to the public in such full, clear, and exact terms as to enable any person skilled in the art or science to which it pertains to practice or use it. Section 4888, U. S. R. S. (35 USCA § 33). Did Weizmann pay for his patent? The certainty which the law requires in patents is not greater than is reasonable having regard to the subject-matter. Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286. This process is a bacteriological one. If there is disclosed a range of treatment sufficiently definite to enable those skilled in the art to successfully practice the invention of the patent, the law is satisfied. This is true though the specification requires those skilled in the art to resort to their skill but not their inventive fac-

ulty in order to practice the invention. Sun Ray Gas Corp. v. Bellows-Claude Neon Co. (C. C. A.) 49 F.(2d) 886, and cases there cited.

Are the characteristics of the bacteria set forth in the Weizmann patent adequate to enable one of ordinary skill in the art to recognize and distinguish them? That they are is abundantly sustained by the evidence. Sir Frederick Andrewes, plaintiff's expert and one of the world's leading medical bacteriologists, has set forth in convenient and condensed form in "Plaintiff's Exhibit 12" a combination of characteristics disclosed in the specification by which the bacteria described in the Weizmann patent and referred to in claims 1 and 3 are identified and identifiable. They are:

"1. Heat Resistance:

"Their spores are heat resisting but are not capable of standing for half an hour the heat of saturated steam having the temperature of boiling water, i. e., 100° C.

"2. Fermentation Characteristics:

"(a) By fermentation of sterile suspensions of maize they will convert the greater part of the starch to produce large yields of acetone and butyl alcohol.

"(b) They will accomplish (a) unaided, e. g., without any addition of nutritive materials or stimulants.

"(c) They will accomplish (a) with free access of air (as in yeast fermentation) or without.

"3. Proteolytic Powers:

"They will ferment maize without any addition of nutritive materials or stimulants, which means that they derive the nitrogen required for their growth from the proteins present in the maize.

"4. Liquefaction of Gelatin:

"They will liquefy gelatin."

Defendant admits, or does not seriously dispute, that the Weizmann bacteria possess all of the above characteristics except one. This one characteristic is numbered 2(c) in the foregoing list. It is: By fermentation of sterile suspensions of maize they [Weizmann bacteria] will convert the greater part of the starch to produce large yields of acetone and butyl alcohol with free access of air (as in yeast fermentation) or without. This characteristic is found in the specification of the Weizmann patent (page 1, lines 17–36), where the patentee states:

"Hitherto the production of acetone and alcohols by the fermentation of starchy bodies has been effected by means of bacteria inter alia by bacteria defined as of the type of Fitz. Fermentation of this kind has always been effected under strictly anaerobic conditions in closed vessels.

"I have found that certain heat-resisting bacteria, which are identified by the fact that they will convert the greater part of maize or other grain starch into acetone and butyl alcohol, and will also liquefy gelatin, can be used for the purpose of obtaining large yields of acetone and alcohols by the fermentation of solutions or suspensions of natural substances rich in starch or other carbohydrates mixed with such substances under aerobic or anaerobic conditions, i. e., with free access of air as in yeast fermentation, or without."

The defendant says that the phrase "as in yeast fermentation" means a fermentation carried on in open tanks, and that in such fermentation the bacteria present must not only be able to adjust themselves to the presence of large quantities of oxygen, in solution or otherwise, but must also be able to hold their own against numerous contaminating organisms inevitably present under these conditions. This is not supported by the record. It is true that "yeast fermentation" is normally carried on in a vessel without any precaution to prevent access of air to the top of the material. It was certainly so understood at the time of the patent application. As pointed out by plaintiff's expert, however, this does not mean that the immediate surroundings in which the organisms are operating contain substantial amounts of free oxygen or air. In yeast fermentation the carbonic acid gas produced in the process of fermenting the mixture blankets the surface of the yeast so that it is actually shielded from the air and the fermentation goes on anaerobically. The patent repeatedly refers to "sterilized" and "sterile" mash. If reasonable precautions be not taken to exclude contaminated air, sterility will not be maintained and the mash may and probably would be contaminated with one or more of many organisms possessing different properties and be highly injurious to the fermentation desired and might even inhibit it altogether. To adopt defendant's contention would involve reading into the patent a wholly unreasonable and unjustifiable limitation.

The defendant contends that the bacteria of the Weizmann patent are facultative; that is, they are both aerobic and anaerobic. In other words, the bacteria of the patent have the dual nature of being both anaerobes and aerobes. The Weizmann patent, however,

says nothing about facultative bacteria. The specification of the patent merely states that the Weizmann bacteria function "under aerobic or anaerobic conditions." Substantial absence of free air or oxygen from their immediate surroundings is necessary in order that they may thrive. When the fermentation is carried on under aerobic conditions, no precautions need be taken to exclude air. Thus commercial operations are greatly simplified when the manufacturer is not compelled to artificially exclude air. The Weizmann bacteria do not require the artificial exclusion of air. The evidence establishes that the Weizmann bacteria are anaerobes. "An efficient anaerobe," says Sir Frederick Andrewes, "is capable of looking after himself. If there are any crevices in the material in which he is living, he is able, as it were, to find little foci free from the oxygen, in which he can begin to grow and multiply, and as he does so, and feeds on the material of the substratum, he evolves large quantities of carbonic acid and hydrogen and gradually these foci extend; the gasses he forms, sweep away all the oxygen until finally the whole mass is free from oxygen, and the conditions anaerobic. That is why I say the really efficient anaerobe can attend to his own domestic affairs without any interference from outside; and Weizmann's bacillus appears to be such an efficient anaerobe that he can do this quite easily. * * *" The adequacy of the characteristics listed in Exhibit 12 to identify the Weizmann bacteria is also accepted by Dr. McCoy, the leading American authority on bacteria used in butyl alcohol-acetone fermentation processes. She testified: "The tests of the Weizmann patent are so chosen, that in combination they are characteristic of the Weizmann organism. It is freely admitted that any one of those tests alone might be characteristic of many other bacteria; but in the particular combination designated in the Weizmann patent, I know of no other bacteria which will correspond." The evidence satisfactorily establishes that the Weizmann bacteria are anaerobes and are not facultative bacteria and are disclosed in the patent with sufficient certainty.

Although the Weizmann patent discloses sufficient characteristics by which the bacteria of that patent are identified and identifiable, it must go further and disclose a method whereby such bacteria may be isolated. The patent sets forth what it terms "a convenient method of obtaining the bacteria." The defendant asserts that such method is inoperative and that the bacteria of the Weizmann patent cannot be isolated by the method set forth in the patent. It states:

"A convenient method of obtaining the bacteria above referred to is as follows:—

"I prepare a number, (say 100), of cultures in the usual way by inoculating e. g., hot (say 90° C. to 100° C.) dilute, (say 2%), sterile maize mash with some maize meal, and then allowing it to ferment at about 35° C. to 37° C. for about four to five days.

"From these tubes I select those which show the most vigorous fermentation, and have a pronounced smell of butyl alcohol. These selected tubes I now heat up to from 90° C. to 100° C. for a period of one to two minutes. Many of the bacteria are destroyed, but the desired resistent spores remain. I next inoculate a sterilized maize mash with the culture which has been heated as aforesaid, and so obtain a subculture. I then heat this subculture up to 90° C. to 100° C. for one to two minutes, and use it to inoculate another sterilized maize mash, and repeat the foregoing subculturing operation a number of times, say 100 to 150 times. In these operations no special precautions need be taken for the exclusion of air."

Three of plaintiff's witnesses testified in great detail as to isolation tests made by them. It is true that none of them found it necessary to prepare as many subcultures as the patentee stated in his patent might be necessary, "say 100 to 150." Each of these witnesses was a person skilled in this particular art and knew what he was looking for and when he found it. If the bacteria sought were obtained without it being necessary to go through a great number of subculturing steps, why do it? Sir Frederick Andrewes fully answered this query. He testified:

"XQ169. Did you ever make as many as 100 to 150? A. No, why should I? I was much too busy.

"XQ170. Because the patent says so. Did you ever try it? A. I have never done it. My object was to get a bacilli which fulfilled the characteristics of the Weizmann bacilli and when I got them I naturally stopped."

Plaintiff's witness Legg, in carrying out his isolation tests, followed the steps of the patent with unusual exactitude. Defendant's criticism of his technique is captious and not sustained by the record. His work clearly established that the Weizmann bacteria were isolated by following the procedure disclosed in the patent.

As to the isolation work of Sir Frederick Andrewes, I adopt the comment of Lord Romer in the British decision: "It is said that the directions given for obtaining the bacteria by a convenient method result, if followed, in the production of an inert culture. Now these directions were followed by Sir Frederick Andrewes and resulted in his obtaining BY" (the symbol used in the British case for the Weizmann bacteria).

Dr. McCoy isolated certain bacteria known as 51 and 51–P, the difference being that the latter were carried to a further extent of purification than the former by a well-known method called "plating." She testified: "The bacteria which I isolated corresponded in every detail to those characteristics as described in the Weizmann patent and on that basis, I should say definitely that they are the same organisms." Dr. McCoy is criticized by the defendant because she started with kernels of corn instead of corn meal. I think this immaterial. After inoculation she placed the tubes in boiling water for a minute. It is true that Weizmann does not in his patent so instruct. But it clearly appears from the testimony of experts on both sides that to do so would be good laboratory practice. After inoculation the patent says you proceed by "allowing it to ferment at about 35° C. to 37° C. for about four to five days." Dr. McCoy incubated her first tubes for four days. "From these tubes," the patent says, "select those which show the most vigorous fermentation, and have a pronounced smell of butyl alcohol." Dr. McCoy detected the presence of butyl alcohol by odor in selecting promising cultures in her isolating work. She used a cubic centimeter of inoculum, although the Weizmann patent does not state how much to use, but simply says to prepare the cultures "in the usual way by inoculating." Weizmann left the selection of the amount of inoculum to the judgment and experience of the operator to determine. Dr. Dack, defendant's witness, also found the best results with the same amount of inoculum. Much stress is laid by the defendant on the fact that Dr. McCoy, after her isolation of the 51 bacteria departed from the instructions of the patent and resorted to what has been termed "plating." In fact, her 51 bacteria were the bacteria of the Weizmann patent and, therefore, there is no force in this criticism. In obtaining 51–P bacteria "plating" was resorted to by her to obtain a more pure bacteria. Furthermore, "plating" was a well-known procedure in the art. Under the evidence it is wholly immaterial whether Dr. McCoy's isolation step be considered as embodied in 51 bacteria or 51–P bacteria. The procedure of the patent was followed and was completely successful.

A careful reading of the testimony of defendant's bacteriologist, Frutkow, convinces one that in his isolation work he was following the Weizmann procedure and that of Dr. McCoy. The testimony of this witness is a complete answer to defendant's contention that the Weizmann isolation procedure is inoperative. It shows that the Weizmann procedure is not only operable but unfailing in the hands of one who wants to succeed. On the other hand, we have the testimony of Dr. Dack and Miss Valentine as to unsuccessful attempts made by them to isolate the Weizmann bacteria. Their testimony is not convincing. They failed, it is true. What the results would have been had they repeated their tests is not known. As to a witness testifying to like effect in the British case, Lord Romer said: " * * * I cannot attach any weight to these experiments of Mr. Yuill's (the defendant's expert) for the description in the Specification is intended for the guidance of those who are desirous of obtaining BY [the designation given in the British case to the Weizmann bacillus] and not for people who wish to avoid getting it, amongst whom I cannot help thinking Mr. Yuill must be included. * * * If anyone follows the instructions with the intention of obtaining a bacillus having the qualities mentioned in the Specification, I am convinced that he will succeed. I do not say that he will succeed every time, for it is possible that the particular piece of soil or the particular specimen of cereal being worked on may not contain BY or may only contain it in negligible quantities. But these are the risks attendant on every attempt to isolate a particular bacillus, and Dr. Weizmann does not attempt to guarantee the searchers after his bacillus from such risks. The description in the Specification predicates, of course, the initial presence of the bacillus. If it be there, the convenient method, if followed, will in my judgment result in its isolation."

Turn now to a consideration of defendant's process and the bacteria used in that process. Is the defendant's process the process of the patent, and are defendant's bacteria the bacteria of the patent? In answer to plaintiff's interrogatories, defendant admits that it has "produced butyl alcohol and acetone by causing fermentation of carbohydrate materials with bacteria"; that the "car-

bohydrate material" was a "mash" made from "corn and water"; that the mash "contained starch among other things"; that in the preparation of the mash "the corn was ground into a meal, the meal was mixed with water"; that the mixture was sterilized by being "heated to 310° F. [155° C.] for 10 to 15 minutes," and then cooled; that the bacteria used in inoculating the mash were those of which a specimen culture was furnished to plaintiff (referred to as USC); and that the fermentation was carried on at "approximately 100° F." (37.8° C.) and continued for "approximately 24 to 36 hours."

By reference to the patent it will appear that defendant's process parallels the process of the patent in every detail. The process of fermentation is described in the patent in the following extracts: "My invention consists in the fermentation of solutions or suspensions of natural substances rich in starch or of other carbohydrates mixed with such substances. * * * The bacteria above indicated can then be used in the production of acetone and alcohol * * * by inoculating with the final culture a cooled solution or suspension of the selected substratum, e. g., maize, which has been previously sterilized for three to four hours at a temperature of 130° C. to 140° C., and a pressure of 2 to 3 atmospheres. I find that in the case of maize meal a suitable suspension for inoculation can be formed by 100 parts by weight of maize meal, and 1500 parts by weight of water. Fermentation sets in after five to ten hours. The optimum temperature of the fermentation lies about 35° C. to 36° C. The fermentation proceeds vigorously for about 36 hours, falling off rapidly after this period, and is completed after a period of about 48 hours. The mash is then distilled, and the products isolated by fractional distillation in the usual way."

It will be noted that the fermentation medium of defendant and of the patent are the same; that is, corn mash which has been previously sterilized by heat treatment adequate for sterilization. The temperature of 37.8° C. used by defendant during fermentation is the temperature of "about 35° C. to 36° C." of the patent. Defendant's time of fermentation is approximately that of the patent.

To plaintiff's interrogatory concerning precautions taken by the defendant for the exclusion of air from the fermentation vessel, defendant answered: "The mixture of carbohydrate material and water was introduced into a closed fermenter, and the gases evolved during the fermentation were permitted to escape through a valve. The air was substantially entirely and as far as possible excluded during the introduction of the mixture and during the fermentation." That defendant's plant operation is not strictly anaerobic appears conclusively from the evidence. Defendant's witness Frutkow testified that when defendant's fermenter is ready to receive a charge of mash, "I would say it is partly full [of sterile air]. There is considerable air in there." In answer to the question, "So that there is air in your fermenters when the first charge of corn mash is put in?" he replied, "Yes sir." Defendant took every precaution to exclude contaminated air. Frutkow clearly distinguishes between "exclusion of air" and exclusion of "contaminated air." In explaining the failure of certain fermentations at defendant's plant by reason of air leakage, he stated: "The air carried the contaminant." When asked, "Sterile air would not have done that?" he replied, "No."

I am satisfied the operation of the defendant is conducted aerobically within the meaning of the patent. Whether carried on aerobically or anaerobically, however, is immaterial, for each of the claims in suit is broad enough to cover an operation whether conducted under aerobic conditions; that is, with free access of air as in yeast fermentation, or under anaerobic conditions.

In the last analysis, therefore, the question now being considered is reduced to one of identity of bacteria. Indeed, this is recognized by the defendant, for in its brief it is said: "Plaintiff's counsel was quite correct in stating that the question will be whether or not the defendant's bacteria are the bacteria described in the Weizmann patent." In determining this point we may again resort to Plaintiff's Exhibit 12. Do defendant's bacteria possess the combination of characteristics set out in that exhibit? First, "Heat Resistance." Defendant's expert, Dr. McKee, admitted that from his study of USC, "its spores are not capable of standing for half an hour the heat of saturated steam having the temperature of boiling water, that is, 100° C." This statement is not only in accord with the tests of Legg, Sir Frederick Andrewes, and Dr. McCoy, but is in substance affirmed by the defendant's bacteriological expert, Dr. Jordan.

Second, "Fermentation Tests." Two sets of fermentation tests were conducted, one

set by Legg and Sir Frederick Andrewes together, and the other by Legg alone. The first group were *with air excluded* and the second *with free access of air.* In each group of tests three sets of bacteria were used: CSC, plaintiff's bacteria; USC, defendant's bacteria; and Q10, bacteria isolated by Legg following the procedure of the Weizmann patent. In all these tests the fermentation was of sterile maize mash by means of these bacteria, unaided, or, in other words, "without any addition of nutritive materials or stimulants." When the first group of fermentation tests was completed, analyses were made of the final products with results shown in the following table:

| | Total Solvents Yield % | Acetone % | Alcohols (Chiefly Butyl) % |
|---|---|---|---|
| Culture | | | |
| CSC | 33.4 | 10.59 | 22.81 |
| | 32.3 | 10.17 | 22.13 |
| USC | 31.1 | 9.86 | 21.24 |
| | 30.9 | 9.91 | 20.99 |
| Q10 | 31.5 | 9.25 | 22.25 |
| | 32.3 | 10.20 | 22.10 |

The significance of the above results is apparent. All of the bacteria employed produced large yields of acetone and butyl alcohol. The yields are substantially the same, the differences found between any two cultures being only of the same order as the differences found in different tests of the same culture.

Like results were obtained in the second group of fermentation tests conducted by Legg and Sir Frederick Andrewes, when no precautions were taken for the exclusion of air. The result of this second group of tests is shown in the following table:

| | Total Solvents Yield % | Acetone % | Butyl % | Ethyl % |
|---|---|---|---|---|
| Culture | | | | |
| CSC | 32.3 | 9.53 | 20.32 | 2.45 |
| | 31.2 | 9.52 | 19.18 | 2.50 |
| USC | 28.6 | 8.69 | 17.27 | 2.63 |
| | 29.4 | 9.61 | 17.76 | 2.03 |
| Q10 | 28.4 | 8.63 | 18.06 | 1.70 |
| | 30.5 | 9.64 | 17.82 | 3.04 |

Another set of tests was conducted independently by Dr. McCoy. In these tests no precautions were taken for the exclusion of air, cotton wool plugs being used in the ordinary way to exclude contaminating air. In this test Dr. McCoy used CSC, USC, and bacteria isolated by her called 51 and 51–P.

These results were obtained:

| | Total Solvents Yield % | Acetone % | Butyl % | Ethyl % |
|---|---|---|---|---|
| Culture | | | | |
| CSC | 31.5 | 10.17 | 19.40 | 1.92 |
| USC | 31.2 | 10.36 | 19.22 | 1.62 |
| 51 | 31.4 | 9.95 | 19.00 | 2.45 |
| 51–P | 30.8 | 9.67 | 18.63 | 2.40 |

The above tests establish conclusively that the bacteria CSC, USC, Q10, 51, and 51–P, function successfully according to the Weizmann patent, unaided, and either with free access of air or without.

To offset the tests of Legg, Sir Frederick Andrewes, and Dr. McCoy, defendant offers certain fermentation tests made by Dr. McKee. These tests were conducted during the two weeks immediately preceding the trial. The plaintiff had an observer present. It would serve no useful purpose to review his tests. Defendant's position as to the fermentation characteristic of USC is against the decided weight of the evidence. A test made by Dr. McKee of USC bacteria apparently gave results not sought by him. He had testified at great length as to certain tube tests made by him to determine whether USC bacteria were capable of operating successfully, under aerobic conditions. In cross-examination he testified:

"XQ572. Did you not make an aerobic, what you called aerobic test under sterile conditions to which you have not referred in your testimony this morning? A. Yes.

"XQ573. Will you please describe that test now? A. I carried out a test which—this is the control tube. I had expected to describe it this morning, but was not asked. I had spoken earlier of taking out for the heat test four tubes and later I spoke of using three of them. * * * Another tube, a larger tube was inclined and it was the expectation that the inclination would be sufficient to permit it to absorb air, and that there would be in that particular case no growth. Actually we were delayed in making the tests until we had some other things to do, and had to hurry away and I did not get to incline it at any time before hand, but put it in and inclined it at once so that there would be a larger surface there. It was put into the oven and later on it was found that fermentation had taken place in it."

"XQ576. And you stated that your purpose in inclining these tubes was for aerobic study, did you not? A. I think I so stated to Dr. Styles. I do not recall that I stated it on the record.

"XQ577. Please look at page 67 of your memorandum. A. Yes, I stated it here as well. I remember stating it verbally to Dr. Styles.

"XQ578. So that that was a test as to whether these USC bacteria when *maintained under sterile conditions would operate under what you call aerobic conditions;* that is correct, is it not? A. That was not correct. I have carried out other tests, many others, perhaps as many as forty under aerobic conditions and none of them have grown.

"XQ579. Will you please limit yourself to the tests to which I am directing my attention and then answer the questions? Will you read the question (XQ578 was repeated as recorded). A. No.

"XQ580. Is not that what you meant when you said *for aerobic study?* A. Yes, it was only one of a number of tubes *for aerobic study.*

"XQ581. Will you please limit yourself to this particular tube and tell me whether or not the test with this particular tube *was not intended to determine whether or not the USC bacteria given sterile surroundings would operate under aerobic conditions?* A. It was one of a number only to determine that.

"XQ582. Then we can take your answer to that question as 'Yes,' can we not? A. You can not.

"XQ583. As directed to this one test? A. It was only one of a number of tests that were directed for that purpose.

"XQ584. But this was one of a number? A. Yes.

"XQ585. So that this was directed to that purpose? A. It was one of a number directed to that purpose.

"XQ586. *And this showed that you got fermentation and complete digestion of the starch, did it not?* A. Yes."

With great reluctance Dr. McKee admitted that defendant's bacteria USC would operate successfully with free access of air, as does CSC, the bacteria of the patent. Notwithstanding the necessity for maintaining sterility of the containers and of the mash, emphasized again and again by Weizmann in the patent specification, Dr. McKee in his open tub test testified he first took the precaution to sterilize his mash and then dumped it into nonsterile tubs for observation. He said:

"XQ651. And you readily admitted, did you not, at the time of these tests, that these tubs were not sterile? A. I did not consider them to have been sterile.

"XQ652. So that you took this sterile corn mash and put it in non-sterile containers, and into that you introduced some cultures which were, so far as you could determine, free from contaminating organisms? A. That is correct.

"XQ653. And then what further precautions did you take during the progress of your tests and your fermentations to prevent the adventitious entrance into the corn mash of contaminating bacteria? A. None excepting to keep the window closed, and I am not even certain that that was done all the time."

Dr. McKee's position that no precautions need be taken to exclude contaminated air is in direct conflict with the repeated references in the patent to "sterilized" and "sterile mash." Nor can one reconcile his procedure in using sterile containers and cotton plugs to build up the inoculum to be used by him in his tub and keg tests and then placing such inoculum in nonsterile containers with free access of contaminated air.

It has been satisfactorily proved by the tests and the testimony as to plant operations of the plaintiff and of the defendant that both plaintiff's bacteria CSC and defendant's bacteria USC possess the same fermentation characteristic, that is, that no precautions need be taken to exclude air, provided reasonable precautions are taken to exclude contaminated air. In none of the tests of either CSC or USC bacteria was any nutritive material or stimulant added. From this it necessarily follows that each possesses the same proteolytic power within the meaning of item 3 of Exhibit 12. That CSC and USC will liquefy gelatin, the fourth characteristic in Exhibit 12, is also clearly established.

I am satisfied that defendant's bacteria USC are the "herein described bacteria" of the claims of the Weizmann patent in suit, and that defendant's process is the process of those claims.

What of the prior art? In the specification the patentee states: "Hitherto the production of acetone and alcohols by the fermentation of starchy bodies has been effected by means of bacteria inter alia by bacteria defined as of the type of Fitz." In referring to bacteria "of the type of Fitz," Weizmann doubtless had in mind the Fernbach patents, as those are the only patents of the prior art relating to the production of butyl alcohol *and* acetone. Fernbach United States patent

No. 1,044,368 states: "A ferment of the type of the butylic bacillus of Fitz is added, care being taken that air does not have access to the mixture during fermentation." In each of the claims reference is made to the "bacillus of Fitz" and to the fact that the fermentation is carried on "in the absence of air." Air must be excluded, and to this end Fernbach suggests the use of an exhausting device. In Fernbach British patent No. 20,073 of 1912 like statements are contained. The Fernbach bacteria require the exclusion of air and are not capable of fermenting maize mash unaided for the production of acetone and butyl alcohol. Fernbach refers in his specification to a Fitz article in 1878. Fitz, however, in a later article of 1882, says of his bacteria that while they would ferment glycerin they would not ferment starch. The Fernbach patents particularly specify the addition of degraded yeast. The Weizmann process is carried on "without any addition of nutritive materials or stimulants." The Weizmann bacteria are capable "unaided" of converting starch. While it is true that Fernbach states that "in some cases * * * the degraded yeast * ,* * can be dispensed with," he does not say it can be dispensed with when maize is the medium employed. It is clear that the Weizmann bacteria are not disclosed in the Fernbach patents.

So far as prior art patents and publications other than Fernbach are concerned, it should be here noted that the defendant does not claim that any one of them discloses bacteria possessing the combination of characteristics set forth in Plaintiff's Exhibit 12. As to this prior art Dr. McCoy testified: "I know of no organism there described which has this combination of characteristics." Again, referring to all the prior art except Fernbach, she testified: "I have compared particularly the organisms which were reported to form butyl alcohol, and I have found no evidence that any of those organisms are able to produce acetone." Indeed, in the appendix to defendant's brief, setting out a table of comparative characteristics of the bacteria of Weizmann, of the defendant, and of the prior art, the statement is made as to all of the prior art except Fernbach, Beijerinck, Emmerling 1902 article, and Schardinger 1905 article, that the process of such prior art publications "produces butyl alcohol (and doubtless acetone)." As to Beijerinck and Emmerling, though not stated, it is likewise doubtful whether the process of either of those publications would produce butyl alcohol *and* acetone. This possibility has no probative force in view of the positive testimony of Dr. McCoy that acetone could not have been present in any of the cases where butyl alcohol was disclosed. The Schardinger 1905 article describes the production of ethyl alcohol and acetone and not butyl alcohol.

These foreign prior art publications come within the principle that a United States patent is not to be defeated by prior foreign publications, unless such publications contain on their face everything necessary to anticipate the patent. "Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defence, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use." Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Hanifen v. E. H. Godshalk Co., 84 F. 649, 651 (C. C. A. 3). There is no disclosure in the prior art which anticipates or in any way limits the Weizmann claims.

Lastly, the defendant contends that the invention of the Weizmann patent is unpatentable since it is for the life process of a living organism. Were the patent for bacteria per se, a different situation would be presented. As before stated, the patent is not for bacteria per se. It is for a fermentation process employing bacteria discovered by Weizmann under conditions set forth in the specification and claims. Undoubtedly there is patentable subject-matter in the invention. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Risdon Iron & Locomotive Works v. Medart, 158 U. S. 68, 15 S. Ct. 745, 39 L. Ed. 899; Cameron Septic Tank Co. v. Village of Saratoga Springs, 159 F. 453 (C. C. A. 2); Dick v. Lederle Antitoxin Laboratories (D. C.) 43 F.(2d) 628.

I conclude that the patent in suit is valid, that the charge of infringement has been sustained, and that the plaintiff is entitled to a decree, with injunction and an accounting.