## C. HOWARD HUNT PEN CO. v. RADIANT POINT PEN CORPORATION et al.

### No. 172.

Circuit Court of Appeals, Second Circuit.

May 22, 1943.

Houguet, Neary & Campbell, of New York City (Edward H. Davis and Harvey L. Lechner, both of Philadelphia, Pa., of counsel), for plaintiff-appellee.

Mock & Blum, of New York City, for defendant-appellant.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff is the owner of two U. S. Patents: No. 2,001,726 which was granted to Lloyd S. Henwood May 21, 1935, for a writing pen and No. 2,121,541 which was granted to the same man on June 21, 1938, for a method for manufacturing pen points. It sued the defendant and its president in the District Court for the Southern District of New York for the infringement of both of the two claims of No. 2,001,726 and claims one and two of No. 2,121,541. The complaint was dismissed on the merits as to the president of the appellant and no appeal was taken from that order. Both claims of No. 2,001,726 and claim 1 of No. 2,121,541 were held valid and infringed and the defendant has appealed.

The patentee undertook in Patent No. 2,001,726 to disclose and claim new improvements in a steel writing pen which would better its wearing and writing qualities by increasing the thickness of the metal at the tip and provide a suitable even flowing point for use in inexpensive fountain pens as well as in ordinary dip pen holders. He succeeded remarkably well. Without an appreciable amount of advertising and apparently because of its own inherent superiority, the pen of the patent has been manufactured and sold in very large quantities. Such success, especially in the inexpensive fountain pen trade which had for many years been putting up with unsatisfactory pen points, is real evidence by way of commercial success that something new and useful was added to a steel pen point by this patentee.

When we come to the evidence of what he did, however, some difficulty in understanding his changes from the old is due to the extremely small dimensions which have to be considered. It was apparently those changes which brought on the great demand for the improved pens though the appellant has suggested that this demand was due to the fact that they were made of stainless steel gold plated. The record, however, shows that other pens made of such steel so plated failed to compete with the patented pen in any way worthy of the name and that is convincing evidence that the material used and the way it was plated cannot be what made the pen so successful commercially.

Those changes may best be brought out by describing first the closest prior art and then the pen of this patent. Steel pens have long been stamped out and bent to shape with slitted points that sometimes had a pierce hole and sometimes did not. Such pens sometimes had thickened points and sometimes not; but as the patented pen did and the invention, if any, is centered on that point we may lay aside all prior pens which had no thickened points. As the thickened point of the patent in suit was made by the bending down of tabs, the prior art now relied upon is confined to that construction and is found in two patents. One is the British Patent No. 2,804 granted to Petit in 1886, and the other is the United States Patent No. 1,365,318 granted to Hawkes on January 11, 1921, and assigned to this plaintiff.

The Petit patent shows a pen point made from a blank which had small and nearly semi-circular projections on either side of the tip. These are bent "* * * towards the underside of the pen and are brought parallel or nearly parallel to each other." The space left between these wings is kept filled with ink so long as any remains in the pen and the capillary attraction of the wings is utilized for that purpose in the trough-like groove they make. A further object stated, and presumably attained, was to prevent the pen point entering the paper when under writing pressure and since the "curvature of the edges of the wings * * * prevents the point of the pen entering the paper by the pressure exercised in writing and as the wings * * * prevent the sharp edge of the slit in the point from touching the paper the scratching of the paper and the spluttering of the pen are avoided." This pen with its bent down wings did not, however, fill the need of the cheap fountain pen trade and though the patent in suit is not much of a departure from the Petit disclosure, if it was, and it was, enough to satisfy a demand that had existed for some ten years or more, it may well be that it took inventive thought and skill to make just that little change which had long eluded others.

The Hawkes patent is for a process of making pens which includes the distortion of the point in the blank at the same time the blank itself is shaped after the annealing step has been taken and before "the pen is hardened, tempered, and slitted in

the usual manner." The type of distorted point which was emphasized in the drawings was that known as the "turned up" and the specifications mentioned ball pointed pens but they also stated that "my invention is applicable to pens having any type of point involving shaping or distortion of the metal, and it will be understood that I do not limit myself to the production of ball pointed or turned up pointed pens." The claims covered the steps disclosed in the order stated. The object of this invention was not to produce a new kind of pen point but to save time and material in making the known types. The defendant, however, insists that the patent in suit discloses nothing new after Petit and if held valid will merely serve to prolong, for the benefit of the plaintiff, the monopoly of the grant to Hawkes.

We do not agree for the reasons to be stated in connection with a description of the patented pen. It is made from a blank differing but slightly from that of Petit in respect to the wings. In Fig. 1 of No. 2,001,726 there is apparently a small indentation at the extreme outer end between the wings which are subsequently bent down but the specifications make no mention of that. The defendant's enlargement of that indentation, if it be one, is what is relied on to avoid infringement but that need not be further noticed on the question of validity.

■ ■ What is said to, and we think does, show an inventive advance over the prior art is not simply the patentee's disclosure of the bending down of the wings or tabs "in planes generally at right angles to the plane of a writing surface on which the pen is adapted to be used," but in so bending them that "the base or upper sides of the tabs are somewhat spaced from each other, * * *" This bending down was done by a tool which was in part a blade five one-thousandths of an inch thick that pushed the blank at that point down between sides of a tool which then moved together to bring the tabs up tightly to the blade. The removal of the blade left them at least its width apart and left that much undistorted material in its former place separating them at "the base or upper sides." Though very small, it was considerable in comparison to the thickness of the metal of the blank and enough to permit the shearing of the slit through it so that this shearing need not cut through the metal added to the pen point by the bending down of the tabs. Both the claims in suit are tied to this new feature which was not present in the prior art and to which may be attributed the usefulness the patent statute makes necessary to entitle an applicant to a patent for what is new. Why this slight change from Petit to a construction which could also be made by the process disclosed by Hawkes for making pen points should have produced what was needed to make the production of cheap fountain pens feasible is hard to grasp. Perhaps that is why no one did it before this patentee and perhaps that is added proof that it took invention to bring it about. However that may be, the British patent did not disclose this feature and so did not anticipate. Art Metal Works v. Abraham Straus, Inc., D. C., 52 F.2d 951; Guaranty Trust Co. v. Union Solvents Corp., 3 Cir., 54 F.2d 400. Hawkes disclosed nothing about spacing metal left in its original plane between any wings or tabs when they were bent down. The claims of this patent are therefore not shown to have been anticipated and are valid as granted.

■ Infringement depends upon whether the defendant has succeeded in avoiding the use of a construction which leaves a metal spacer, made of the blank metal undeformed in the process of bending down the wings, between the tabs at their bases when they are bent down. It has attempted to do so by putting a V-shaped indentation in the end of the blank between the wings before they are turned down. It is a comparatively great increase of the notch shown in Fig. 1 of the patent if one is really shown there. Though the defendant has by so doing removed some of the metal between the tabs it is clear that it has not removed it all and that when its tabs are turned down there is a metal spacer between them which plays its part in that operation and is sheared instead of the added metal when the slit is made in the pen. This metal spacer is in fact one thousandth of an inch wider than that of the patented pen for the defendant uses a tool in the bending which has a blade that much wider than the plaintiff uses in making the pen of the patent. The sides of the wings are squeezed against this blade in a different manner than the plaintiff employs for that operation but the result is the same in that the tabs are put tightly against the blade of the tool and remain apart to the extent of its width. The only thing which can, therefore, prevent the accused pens from

infringing both claims in suit is the fact that the metal between them does not extend all the way to the ends of the tips. Nothing in the specifications or the claims so limits them. There is in fact a metal spacer in the plane of the blank metal at that point before bending which joins the tabs while they are being bent and after they are bent until it is sheared to separate them. That takes over as much of the invention as is needed to put and hold the tip in position for slitting between the added metal and therefore to make the pen of the patent. Accordingly there is infringement unless the claims are narrowed by file wrapper estoppel so as not to cover what the defendant has done.

■ The application originally contained a claim numbered 7 which was, indeed, broader in some respects than claim 2 as allowed. It was cancelled. But it was not broader in respect to the area of metal left between the wings when they are bent down and before they are slit. By the cancellation the patentee gave up nothing on that score and the claims in suit were not affected in that respect at all. There is consequently no estoppel to be considered on this appeal.

■ The second patent in suit claims a method new only in that it adapts, to the step of the opening the slit in a pen point of the kind we have been considering, the old smithing act of swaging. These slits in pens are, when and if sheared, of the same width from the end to the pierce hole if there is such a hole, and when there is not, the slits are of the same width throughout. It is desirable to have them taper from a little width at the back to nothing at the writing end of the pen point. Sometimes slits were cut with thin abrasive wheels to produce this taper but that required accurate and expensive handling as well as the use of delicate tools. One may well wonder why no one before the patentee opened the sheared slit in a metal writing pen by swaging but, so far as appears, no one did. He used a tool made of die members which pressed the metal thinner in the middle part of the pen back of the pierce hole when one was used and back of the end of the slit when one was not. In the specifications he designated as 14 the die member through which such pressure was exerted. The rear end of the slit was thus opened and the result was as the patentee said in his specifications that: " * * * member 14 may be of uniform width throughout its working edge so as to produce a slot of uniform width from the pierce hole to the tip. In this case the tips of the pen may be brought into contact with each other by pressing them together, for example, during the 'raising' operation which gives the pen its rounded shape." But he didn't rely wholly upon this fairly obvious way of spreading the nibs and then pressing the tips together after the swaging. He also disclosed a method whereby the swaging itself brought them together as follows: " * * * I also contemplate carrying out the operation in such a manner that the side portions of the pen at the heel are separated from each other to a greater extent than the side portions in the region of the pierce hole 11. This will result in the immediate formation of a tapered slot and may be accomplished by arranging the working tools so as to exert greater pressure toward the heel end of the pen or, * * * by making the tool 14 of somewhat tapered shape, with the narrow edge overlying the region of the pierce hole 11 and the wide edge the base of the heel 8. In either event, the metal toward the base of the heel is subjected to a pressing operation which causes a greater separation of the edge portions of the pen at the heel than in the region of the pierce hole, with the result that the slot is of tapered shape." This was shown to be a new and useful adaptation in the manufacture of pens of an old process to cause metal to flow in the pen in such a way that the slit was in one operation opened as and where desired and closed at the extreme tip. It was not anticipated and if it involved invention the claims are valid. It is, though now seemingly simple, such a good way to do what has in other ways been done to millions and millions of steel pens that we think it fair to believe that it would have been done by others long before had it not needed invention to apply it to such use. We agree therefore that the claims are valid.

The defendant opens the slots in the accused pens by putting pressure in the places it should be put to do that. It finishes this part in the making of its accused pens as its president testified as follows: " * * * now I open both the nibs by striking at different points from the pierce hole down back of the pierce hole and I close the points simultaneously by striking in the front, which opens and closes simultaneously that pen to open the slit." This language becomes plain enough at least upon a second reading. There is swaging which will

open the slit ("open both nibs") by striking, "down back of the pierce hole" and "I close the points simultaneously by striking in the front." That is clearly the method the patentee disclosed and covered ⸱broadly in claim 1 which we hold to have been infringed as held below. The trial ʼjudge thought that claim 2 was narrower and not infringed since " * * * there has been no swaging of the metal at the opposite sides of the slit in the accused pens." Very likely infringement of claim 1 makes infringement of claim 2 unimportant presently as a practical matter and at any rate the plaintiff took no appeal. We do not, therefore, express any opinion as to whether or not claim 2 is so limited that it was not infringed.

Decree affirmed.