## RADIO CORPORATION OF AMERICA et al. v. COLLINS RADIO CO.
### No. 1117.

District Court, D. Delaware.
March 4, 1936.

Thomas G. Haight, of Jersey City, N. J., Stephen H. Philbin (of Fish, Richardson & Neave), of New York City, Abel E. Blackmar, Jr. (of Sheffield & Betts), of New York City, and William G. Mahaffy, of Wilmington, Del., for plaintiffs.

George I. Haight and M. K. Hobbs, both of Chicago, Ill., John B. Brady, of Washington, D. C., and Ayres J. Stockly (of Hastings, Stockly & Duffy), of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a motion for a preliminary injunction in a patent infringement suit against Collins Radio Company. In their bill of complaint plaintiffs charge defendant with infringement of two patents by manufacturing and selling radio transmitters and receivers. The two patents were granted to Lee De Forest on September 2, 1924, and are held by plaintiffs as his assignees. Grounds of opposition to the motion are invalidity, estoppel, and laches.

The De Forest patents relate to a vacuum tube and its associated circuits so arranged as to feed back a portion of the energy in the plate circuit to the grid circuit to progressively build up the electric currents in the circuits. Patent No. 1,507,017 covers broadly the feed-back circuit and patent No. 1,507,016 covers that circuit when so arranged and adjusted as to generate continuous electrical oscillations.

Defendant was incorporated in 1933. Its principal business is the manufacture and sale of radio transmitting apparatus at Cedar Rapids, Iowa. It has also sold radio receivers. It designates the transmitting device 4A transmitter and the radio receiver RME–9D. Defendant asserts it has sold only 46 receivers "as a matter of accommodation to customers and without profit" and that before the bringing of this suit "defendant had discontinued the purchase and sale of receivers and has since sold none and has no plan or intent of offering for sale radio receivers." Assuming that defendant has discontinued the sale of receiving apparatus, injunctive relief with respect thereto may still be appropriate. Defendant has made and sold devices and apparatus embodying and employing the respective inventions of the De

Forest patents in suit and is continuing so to do. This is fully shown by the affidavits on file. Respecting infringement, defendant's position is that it does not infringe because the De Forest claims are anticipated.

Both De Forest patents have been held valid and infringed in prior litigation carried to the Supreme Court of the United States. It is well settled that a motion for a preliminary injunction against infringement of such patents should be granted without other proof, unless new evidence is produced by defendant of such weight that it would probably have led to a different conclusion if it had been introduced in the prior litigation. Walker on Patents (6th Ed.), § 705, states this rule as follows: "It is an uncontrovertible rule of equity jurisprudence that where there has been a prior adjudication sustaining a patent and an infringement thereof in the same or another circuit, where the validity of the patent has been contested on full proofs, the District Court should, upon a motion for a preliminary injunction, sustain the patent, grant an injunction and leave the question of its validity to be determined upon the final hearing."

The Third Circuit Court of Appeals affirmed the granting of a preliminary injunction because a patent had been previously sustained: "But we think it should be regarded as a finality until sufficient reason for departing from it shall have been made to plainly appear, and that the appellee should not, upon a motion to dissolve a preliminary injunction, be deprived of the advantage it holds as the owner of a patent adjudged by a court of appeals to be valid, upon anything less than thoroughly convincing additional proofs." Adams v. Tannage Patent Co. (C.C.A.) 81 F. 178, 179.

### Prior Litigation.

For years the De Forest patents have been in the courts. They have been sustained against repeated claims of prior invention and anticipation. In 1934 the validity of both patents was finally established by the Supreme Court of the United States. That court, speaking through Mr. Justice Cardozo said:

"After all that has been written about the DeForest patents in these many years of litigation, there is no need to fill the pages of our reports with an analysis of the opposing arguments as if we were a court of first instance trying the controversy anew. For present purposes it is enough to bring out into sharp relief a few considerations of dominating significance. Patent No. 1,507,017 is for an invention known as a 'feed-back circuit' and patent No. 1,507,016 for an invention known as the audion 'oscillator.' The two, however, are closely associated, for the oscillator can be produced only by use of the feed-back circuit, though the feed-back circuit can be used without producing an oscillator. As far back as 1908, DeForest had received a patent for a form of vacuum tube to which he gave the name of 'audion.' The Fleming vacuum tube in use up to that time had in it a metallic filament, which was electrically heated to incandescence through an input circuit, and a cold metallic plate to which electrons were transmitted from the filament, passing from the plate to another or output circuit. DeForest's 'audion' changed the Fleming tube by interposing a special wire known as the 'grid' between the filament and the plate, thereby increasing its capacity as a detector of waves of radio or inaudible frequency and serving better to transform them into waves of audible frequency. * * *

"DeForest with his assistant Van Etten had been working during the summer of 1912 along two lines of thought. One was the use of the audion as a telephone repeater to amplify weak telephone currents and thus facilitate the transmission of long distance messages. The other was its development as a generator of alternating currents for any and all uses, some perhaps indefinite, that were capable of being served by oscillations thus produced. On August 6, 1912, a diagram showing a feed-back hook-up of the input and output circuits is recorded in Van Etten's note book with a note that by the use of the coupling 'a beautiful clear tone' had been developed, which means that oscillations had been produced and that the oscillations were sustained. There is also a note that the pitch, i. e., the frequency, was varied by altering the plate voltage, which means, or was understood, we are told, by DeForest to mean, that by other simple adjustments the frequency of the oscillations could be varied at will. * * * He [DeForest] maintains, with the backing of other witnesses, that upon discovering the effect of the feed-back in generating sustained oscillations of the plate, he understood at

once that by controlling the inductance or capacity in the oscillating circuit he could also control the frequency. This, he says in substance, must have been obvious upon reflection to any competent electrician, though there would be need of a certain amount of adjustment and experiment in substituting the correct inductance or capacity, a process, it is argued, that would be well within the ability of any one skillful in the art. Beyond this he insists that having discovered the generative virtue of the feed-back, he was not confined in his invention to the uses then developed, but if his patent claims were broad enough was entitled to the benefit of other and related uses made manifest thereafter.

"We think that for all these contentions of DeForest adequate support exists in the record and the law. There is evidence that in August, 1912, he discussed with his assistants the possibility of using sustained oscillations of the audion in generating and transmitting radio waves as well as those of audio frequency. There is evidence that intermittently in 1913 he worked upon that theory, and particularly that on April 17 of that year at Palo Alto, Cal., he received a clear note, the true heterodyne beat note, from the radio signal station at San Francisco Beach with the aid of the coupled circuits. The entry in his note book made the same day tells us, 'This day I got the long looked for beat note.' This was long before he had heard of Armstrong or of like experiments by any one. There is evidence that in the early part of 1914, he renewed his investigation in that field of research, after being temporarily diverted, and finally on February 27, 1914, recorded in his note book, as the outcome of a number of experiments, that he had 'full proof that the audion acts as a generator of high frequency currents.'" Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 10, 55 S.Ct. 928, 932, 79 L.Ed. 163.

In the above case the Supreme Court reviewed the earlier cases dealing with these De Forest patents. Respecting Westinghouse Electric & Mfg. Co. v. De Forest Radio T. & T. Co., 21 F.(2d) 918, decided by the Circuit Court of Appeals for the Third Circuit in 1927, the Supreme Court says: "All three were affirmed with a comprehensive opinion by Woolley, J., marshaling the evidence and weighing the competing arguments. As the upshot the court held that the presumption of validity which protected the DeForest patents had not been overthrown, and that apart from any presumption DeForest had made out his title as the original inventor."

From the exhaustive opinion in the Third Circuit I shall extract one illuminating passage that is a forecast of the final decision as to the validity of the De Forest patents: "DeForest had long been an electrical engineer and inventor of high order. In 1907 he invented the 'epoch marking invention, the audion,' and was, perhaps, more familiar with its organization and uses than any one else in the electrical arts. In 1912, when employed as chief research engineer for the Federal Telegraph Company at Palo Alto, California, he was engaged in experimental work on a great variety of subjects having to do with wire and wireless transmission of sounds. In August of that year he was investigating a two-way telephone repeater and the use of the audion for amplifying wireless messages. On August 6, 1912, when at work with only one available audion, he suggested to his laboratory assistant, Herbert B. Van Etten, that it might be possible to make the one audion do the work of two by obtaining greater amplification. He therefore directed him to connect the output circuit of the one audion back into inductive relationship with its input circuit. That, every one now concedes, was the feed-back circuit of the invention. Van Etten did this and, instead of the hoped-for amplification of telephone signals, he obtained a clear, pure musical note in the telephone receiver. Every one concedes that such a note is made by an alternating current or the sustained oscillations of the invention. Here are two facts; neither is disputed. Immediately, Van Etten entered them in his laboratory notebook. Neither the certainty of the entries nor the authenticity of the book has ever been questioned; nor has Van Etten's position as working under the direction of DeForest been attacked. Therefore, as we read the record, DeForest's claim to the invention starts with these facts and this date established." Westinghouse Electric & Mfg. Co. v. De Forest Radio T. & T. Co. (C.C. A.) 21 F.(2d) 918, 924.

Six years ago this court issued a preliminary injunction in a suit to enjoin infringement of these De Forest patents. In January, 1930, the present plaintiffs brought suit in the District Court of Delaware against the Universal Wireless Com-

munication Company, for infringement of the same claims of the two De Forest patents as are in issue here. Judge Morris, after a hearing on affidavits filed by both parties, granted a preliminary injunction, and thereafter, on trial on the merits before him, granted an interlocutory decree holding the patents in suit valid and infringed.

### New Evidence.

Defendant contends the De Forest patents are invalid because anticipated by Goddard patent, No. 1,159,209, and by a Lindredge article entitled "Ionized Gas for Telephone Repeaters" published in the September, 1912, issue of the "Telephone Engineer."

The Goddard patent was cited by the Patent Office during the prosecution of the applications which resulted in the De Forest patents. It is referred to in both file wrappers of the De Forest patents and must have come to the attention of every person who examined the history of those patents. It is a well-established rule that, where a reference has been cited by the Patent Office during the prosecution of an application for a patent, the court will not invalidate the patent on the basis of that reference unless clearly convinced that the Patent Office acted incorrectly in withdrawing the reference and permitting the patent to issue. This court has said that the presumption of validity of a patent, arising from its issuance "is made stronger when, as here, the best prior art invoked by the defendant was cited and disregarded in the Patent Office." Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills (D.C.) 1 F. Supp. 643, 644. In the long litigation that followed, the Goddard patent was wholly disregarded.

Moreover, the Goddard patent is different from the De Forest patents. Goddard operates by diverting the current through the tube from one path to another and back again. De Forest operates by virtue of controlling the strength of the current which flows through the tube in an unchanging path. Goddard has never gone into use and is a totally impractical device for the production of oscillations. Defendant still contends that Goddard anticipates De Forest provided (1) a double acting De Forest tube be substituted for the Goddard tube; (2) half of this new circuit be cast aside; and (3) the arrangement be reconstructed to that of the De Forest patents. Anticipation cannot be made out in this way. "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. * * * It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result." Skelly Oil Co. v. Universal Oil Products Co. (C.C.A.) 31 F.(2d) 427, 431. The Goddard patent does not disclose the inventions of the De Forest patents.

The Lindredge article in the "Telephone Engineer" of September, 1912, has been held repeatedly not to affect the validity of the De Forest patents. It has been relied upon for the purpose of defeating the De Forest patents in practically all litigation involving those patents. In Radio Corporation v. Radio Engineering Laboratories, Inc., quoted at length in this opinion, the Lindredge article was offered in evidence and reproduced in the printed transcript of record on appeal before the Circuit Court of Appeals (66 F.(2d) 768), and on certiorari before the United States Supreme Court. Lindredge himself testified at the trial in the District Court (1 F.Supp. 65) and was referred to in the opinion of Judge Campbell.

In the Universal Wireless Communications Co., Inc., suit in this court the Lindredge article was annexed to an affidavit submitted by defendant in opposition to the motion for a preliminary injunction and was discussed in the briefs in opposition to the motion. At the argument of the motion, it was pointed out by Judge Morris that the inventions covered by the De Forest patents had been sustained and held valid as "against Lindredge."

### Estoppel and Laches.

Defendant also suggests that plaintiffs in prior litigation elected to assert the validity of the Armstrong patent over De Forest and on account of this "election" plaintiffs are now estopped to assert the validity of the De Forest patents. This defense of estoppel was put forward by defendant in all the courts considering the Radio Engineering Laboratories Case. In the brief of defendant before the Supreme Court, the following statement appears: "To uphold the validity of petitioner's patents would prolong the exclusion of the respondent, and of the public generally, from the use of these important inventions

for a period of ten years in addition to the seventeen years covered by Armstrong's patent, that is, up to September 2, 1941."

Defenses raised to a motion for a preliminary injunction and already passed upon by other courts in prior litigation bar such defenses here. Moreover, this defense is of such character as not to carry conviction that it would have wrought a different decision in the prior litigation.

. During the argument, it was suggested that there was delay in bringing this suit and in moving for a preliminary injunction. A reading of the affidavits shows that this suggestion is without merit.

A preliminary injunction must issue.