**HARTFORD NATIONAL BANK AND TRUST COMPANY, Trustee, and Philips Laboratories, Inc., Plaintiffs,**

v.

**E. F. DREW & CO., Inc., Defendant.**

**Civ. A. No. 1470.**

United States District Court
D. Delaware.
July 1, 1955.

See also 13 F.R.D. 127.

Arthur G. Connolly, Thomas Cooch and Thomas S. Lodge, Wilmington, Del., Connolly, Cooch & Bove, Wilmington, Del., for plaintiffs.

Aaron Finger and William A. Worth, Jr., Wilmington, Del., Richards, Layton & Finger, Wilmington, Del., and H. C. Bierman, New York City, for defendant.

LEAHY, Chief Judge.

Plaintiff sues for infringement of **patent** No. 2,441,091 relating to an improved process for producing provitamin $D_3$[1]. Claims 12 and 24 are in issue. Defenses are prior art and lack of identity of defendant's process. Plaintiff claims the two published prior art articles relied on by defendant do not disclose the inventive steps of the patent; and defendant's only witness departed from the teachings of the two prior art articles when he said he produced the product envisaged by plaintiff's patent process.

*Infringement.* The patent deals with a process for the synthesis of 7-dehydrocholesterol, known as provitamin $D_3$ and convertible to vitamin $D_3$[2] by known irradiation with ultra violet light. The inventors are Dr. Jacob van der Vliet and his associate, Dr. Willem Stevens, of the Netherlands. They were employed by N. V. Phillips' Gloeilampenfabrieken.[3] The patent involves 1. the reaction of a sterol derivative (such as cholesterol ester) with a halogenating agent which substitutes a corresponding halogen[4] atom at the 7-position of the cholesterol molecule for the hydrogen atom; and 2. subjecting the resultant 7-halogenocholesterol to treatment with specific chemicals capable of dehydrohalogenating it. The inventive feature of the process is the second step which results in the introduction of a double bond at the 7–8 position of the designated molecule to produce the 7-dehydrocholesterol.[5]

Defendant's answers to interrogatories describe the method it uses to convert cholesterol to 7-dehydrocholesterol. The process for manufacturing 7-dehydrocholesterol was described by defendant:[6]

(a) "The 7-dehydrocholesterol or vitamin $D_3$ is made by mixing the benzoyl ester of cholesterol with N-bromsuccinimide in an organic solvent, the mixture being heated for a sufficient length of time to form 7-bromcholesterol. This product is

1. The processed substance may be converted to vitamin $D_3$. The patent in suit is not concerned with such conversion.

2. Vitamin $D_3$ is an antirachitic vitamin present in cod liver oil and thought to be essential for the formation of healthy bones and teeth in humans and animals.

3. Plaintiff Hartford National Bank and Trust Company holds title to the patent as Trustee for N. V. Philips' Gloeilampenfabrieken, et al., under deed of August 25, 1939. Plaintiff Philips Laboratories, Inc., is exclusive licensee of Hartford with right to sue infringers.

4. Of the family of chemical elements: chlorine, bromine, fluorine, and iodine.

5. Only claims 12 and 24 are in suit and which call for the combination of the process steps just discussed. Claim 12 specifies the 7-dehydrosterol ester is heated with a saponifying agent to remove the ester group. Claim 24 does not require any saponification step but specifies the halogenating agent is N-bromsuccinimide.

6. PX 4, 5, 6; PX 5 par. 4(a); PX 6; T. 42–43.

then separated from the by-products of the reaction and then heated to form 7-dehydrocholesterol. The latter is then irradiated to give vitamin D."

(b) "The benzoyl ester of cholesterol is dissolved in an organic solvent, mixed with N-bromsuccinimide and heated to form 7-bromcholesterol benzoate. It is separated from the by-products and then heated in the presence of calcium hydroxide (containing a small amount of pyridine) to form 7-dehydrocholesterol benzoate; oxygen is excluded during this reaction. The 7-dehydrocholesterol benzoate is then treated with the sodium ester of methanol by the Meerwein-Ponndorf reaction to form 7-dehydrocholesterol. It is irradiated to give vitamin $D_3$."

Plaintiffs' Dr. van der Vliet's testimony indicates this method includes all the elements of claims 12 and 24.[7] At trial defendant's expert, Dr. John J. Ritter,[8] had doubt whether defendant employs the saponification step of claim 12. Then later he testified defendant's process involves cross-esterification rather than a saponification.[9] Dr. van der Vliet was direct and believed defendant's process involved a saponification reaction.[10] On cross-examination it was apparent Dr. Ritter's cross-esterification distinction, was caused by a difference in semantic terminology, for he recognized the ester group on the 7-dehydrocholesterol ester produced by defendant was, in fact, removed in defendant's process because a conventional saponification reaction involves removal of an ester group.[11] If defendant's process does not involve a saponification reaction, no doubt it utilizes a chemically classic equivalent.

Defendant's admitted procedures infringe claims 12 and 24. Each step of the process covered by claims 12 and 24 of the patent in suit is found in defendant's process as described by defendant itself.[12]

■ *Patent Validity.* Before trial defendant relied on 24 items of prior art. At trial reliance was narrowed to two publications: a. the Wohl and b. the Ziegler articles.[13] No other ground of invalidity was pleaded nor was other evidence on any other ground introduced at trial.[14]

The prior art:

a. The Wohl article is DX 3. Defendant's attorney referred to it in his opening statement.[15] Defendant's only witness admitted there is nothing in Wohl on cholesterol or its treatment;[16] and it was conceded Wohl did not work with cholesterol.[17] The only precise citation by defendant of Wohl was that substances such as N-bromacetamide would "react with" various unsaturated compounds to produce a bromine atom at the carbon atom adjacent to the double bond.[18] Plaintiffs do not dispute this for the patent refers to this known re-

7. T. 47–50 and 50–53.

8. Dr. Ritter qualified as a "general synthetic organic chemist" but disclaimed experience in the chemistry of sterols or in the treatment of cholesterol or analogous products prior to engagement to testify in this litigation. T. 91, 93.

9. T. 107–109.

10. T. 50.

11. T. 139–140.

12. T. 47–50, 50–53.

13. DX 3 and 5.
Defendant's witness conceded none of the other prior art patents and publications (DX A to H) referred to either

production of 7-halogenocholesterol compound or its dehydrohalogenation (T. 137–138). Since these two critical steps are present in the patent in suit, the prior art was entitled to little weight.

14. A pleaded "misuse" defense was abandoned at trial (T. 145). In any event, "misuse" goes to enforceability not validity. See Metals Disintegrating Co. v. Reynolds Metals Co., D.C.Del., 107 F. Supp. 105.

15. T. 14–15.

16. T. 125.

17. T. 15.

18. T. 14–15.

action.[19] In fact, defendant conceded Wohl was not concerned with the essential inventive step which requires the 7-halogenocholesterol to be dehydrohalogenated in order to produce the desired 7-dehydrocholesterol.[20]

b. The Ziegler article is DX 5. The Patent Examiner had it during prosecution of the application on which the patent issued.[21] Allowance of the application over Ziegler entitles his article to little weight, for it was overcome during prosecution. Ziegler has 38 pages in the original German and 32 in the translation. But only one paragraph is relevant.[22] It reads:

"With the utmost ease—in a few minutes—the esters of the cyclic olefin alcohol cholesterol can be brominated with bromsuccinimid. What is involved, as in all cases heretofore described, is a smooth substitution, since quantitatively succinimid is re-formed. Naturally we have further pursued obvious consequences. *On this subject we shall later report in a separate work.*" (Emphasis added).

Ziegler says nothing about the type of compound which would be formed by the described bromination reaction; and no reference is had to dehydrohalogenation treatment such as is required by the patent in suit to produce the desired 7-dehydrocholesterol. Ziegler makes no reference either to 7-nalogenocholesterol or 7-dehydrocholesterol.[23] As the court at trial suggested:[24]

"Q. To put it in non-scientific language, you say that while Ziegler may have suggested a path in the forest, he never pointed it out, nor did he walk down it? A. That is right, sir."

Defendant's witness confirmed this view.[25]

*Conclusions.* I do not believe a general synthetic organic chemist with no expertise in the chemistry of sterole, given Wohl and Ziegler (nothing else) could produce the substance resulting from the process of the patent by making use of general chemical information. At least no such chemist so testified.[26] Moreover, defendant's Dr. Ritter conceded equal molecular proportions of the reactants should be used in accordance with normal practice.[27] His report[28] shows a use of excess of one of the reactants which admittedly might produce a different product than when normal proportions were used.[29] There was also a discrepancy in the melting point of 7-dehydrocholesterol benzoate and the product obtained by Dr. Ritter—clearly such was not that called for by plaintiff's patent.[30] Dr. Ritter conceded these melting points should check within ½ degree for proper identification—while his product had a melting point more than 10 degrees lower than it should

19. PX. 1, col. 1, line 43, col. 2, line 8.

20. T. 138.

21. PX 1, col. 2, lines 4–8, and col. 8, lines 27–29 and 41.

22. DX 6.

23. Conceded by defendant's expert: T. 124–125.

24. T. 41.

25. T. 138.

26. The problem given to Dr. Ritter (defendant's expert) was to convert cholesterol benzoate into 7-dehydrocholesterol benzoate (T. 122). No reference is found in either Wohl or Ziegler to these two products (T. 124). Dr. Ritter in his experiment was supposed to follow the quoted paragraph of Ziegler, supra, which deals with treatment of cholesterol (T. 126). He admitted he did not follow that paragraph of Ziegler "to closely" in the "essential" dehydrobromination step, i. e., dehydrohalogenation where the halogen is bromine.

27. T. 141, 144.

28. DX 7.

29. T. 128, 142.

30. T. 130.

have been,[31] under the teaching of the patent in suit.

■ The evidence supports validity of plaintiff's patent. It is clothed with a presumption of validity, especially where it was granted only after the best prior art was cited against it and distinguished in the Patent Office. United Mattress Machinery Co., Inc., v. Handy Button Machine Co., 3 Cir., 207 F.2d 1; Artcraft Silk Hosiery Mills, Inc., v. Gotham Silk Hosiery Co., Inc., 3 Cir., 72 F.2d 47, certiorari denied 293 U.S. 595, 55 S.Ct. 109, 79 L.Ed. 688; Container Company v. Carpenter Container Corp., 3 Cir., 194 F.2d 1013, certiorari denied 344 U.S. 826, 73 S.Ct. 26, 97 L.Ed. 643.[32] See 2 Walker on Patents (Deller's ed.) § 249, p. 1221. Looking back at the administrative proceedings, the Examiner considered Ziegler and concluded he failed to teach the rule of the invention in suit.

Comment. The state of the art of producing Vitamin $D_3$ before the appearance of van der Vliet and Stevens shows the substance had been produced commercially by either the "mussel" or the "Windaus" process. The first required considerable quantities of mussels; these were taken from the ocean

floor, cooked, the shells removed, the cooked meat extracted with organic solvents; after this process a small amount of vitamin $D_3$ was recovered. The Windaus process involved six chemical steps for conversion of cholesterol into provitamin $D_3$; the yield was low.[33] Both methods were expensive and lacked high efficiency. They were the only known commercial methods in use. Chemical investigators in the field were searching to develop a synthesis for provitamin $D_3$.[34]

No satisfactory replacement for the mussel or Windaus methods was found until van der Vliet and Stevens offered the invention found in the present suit.[35] Thereafter the Windaus and mussel processes were abandoned both here and abroad and the process of the patent was adopted.[36, 36a]

■ True, the inventors here were not the first to produce 7-dehydrocholesterol. But, they were first to invent a process (described in the patent) which permitted provitamin $D_3$ to be produced on a commercial basis in an efficient, cheaper and less complicated manner. Their task and project did, in view of the art, call for "the exercise of inventive genius."[37] Quick commercial suc-

---

31. T. 130.

32. This Court (per Nields, J.), in Radio Corporation of America v. Collins Radio Co., D.C.Del., 13 F.Supp. 976, 979, held: "It is a well-established rule that, where a reference has been cited by the Patent Office during the prosecution of an application for a patent, the court will not invalidate the patent on the basis of that reference unless clearly convinced that the Patent Office acted incorrectly in withdrawing the reference and permitting the patent to issue."

33. T. 33–35.

34. T. 36.

35. T. 36.

36. T. 36–37.

36a. Much expensive equipment used in the two former processes had to be written off and abandoned as the patent process required a small amount of equipment occupying a lesser space than formerly required by each of the former processes (T. 39–40).

37. From this Court, Guaranty Trust Co. of New York v. Union Solvents Corporation, D.C.Del., 54 F.2d 400, affirmed 3 Cir., 61 F.2d 1041, certiorari denied 288 U.S. 614, 53 S.Ct. 405, 77 L.Ed. 987, is apt. Examining the circumstances surrounding a patent, such as in suit, Judge Nields, 54 F.2d at page 403 wrote: "Weizmann (the patentee) was not the first to produce acetone and butyl alcohol by a fermentation process. He made no such claim. Mere production of limited quantities of acetone and butyl alcohol by a fermentation process was not the problem with which Dr. Weizmann was dealing. The problem with which he was dealing and successfully solved was that of isolating a particular bacteria or a culture containing some particular bacteria that would produce butyl alcohol and acetone in *commercial quantities better than any other known*

cess of a new process "looms [large] in the evaluation of the inventive thing".[38] Plaintiffs' new process was quickly adopted in the industry. No other method is in commercial use at the present time.[39] Time sequence has importance: Ziegler's contribution was adding to Wohl's halogenating agents a further compound, N-bromsuccinimide; otherwise his advance over Wohl was negligible.[40] Wohl was available for 20 years and knowledge of the shortcomings of the "Windaus" and "mussel" methods was known for 6 or 7 years;[41] yet no one in the field was able to discover this invention before van der Vliet and Stevens.[42] When invention is appraised as of the date it was made, rather than with the clarity of hindsight, requirements of the patent law are satisfied. Ingersoll Milling Machine Co. v. General Motors Corp., D.C.N.D.Ill., 110 F.Supp. 12, affirmed 7 Cir., 207 F.2d 42; Town v. Willis, D.C.W.D.Mo., 85 F.Supp. 483, affirmed 8 Cir., 182 F.2d 892; Federal Machine & Welder Co. v. Mesta Machine Co., D.C.W.D.Pa., 27 F.Supp. 747, reversed on other grounds, 3 Cir., 110 F.2d 479.

■ Results. Claims 12 and 24 of patent No. 2,441,091 are valid and infringed by defendant. Plaintiffs are entitled to their injunction against further infringement. Plaintiffs are also entitled to an award of damages for defendant's infringement.

As this opinion contains the required findings and conclusions, an order may now be submitted by plaintiffs after notice.

---

bacteria. Weizmann discovered a particular species of bacteria new to bacteriologists and invented the process of successfuly employing them. This task called for the exercise of inventive genius. He obtained his patent, not for the bacteria per se, but for a process which consists in the employment of certain bacteria to produce large yields of acetone and butyl alcohol under aerobic or anaerobic conditions." (Emphasis by Court).

38. Metals Disintegrating Company v. Reynolds Metals Company, D.C.Del., 130 F.Supp. 227.

39. T. 36–37.

40. T. 38.

41. T. 37–38.

42. That extensive search was in the field (circa) in the Ziegler-Wohl period is suggested by the large number of prior art references originally put by defendant. "And it has been held that the excessive number of such references is in itself persuasive of the futility of prior attempts to solve the problem". Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 404, certiorari denied 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369.