HARTFORD NATIONAL BANK AND
TRUST COMPANY, Trustee, and Phil-
ips Laboratories, Inc., Plaintiffs,

v.

E. F. DREW & CO., Inc., Defendant.

Civ. A. No. 1470.

United States District Court
D. Delaware.

July 26, 1960.

Arthur G. Connolly and Januar D. Bove, Jr. (of Connolly, Cooch & Bove), Wilmington, Del., for plaintiffs.

Ernest S. Wilson, Jr. (of Morford, Young & Conaway), Wilmington, Del., William J. Barnes, Stuart A. White, and Roger R. Phillips, New York City (of Fish, Richardson & Neave), New York City, for defendant.

LEAHY, Senior District Judge.

This is a patent infringement suit. The patent (2,441,091) was held valid and infringed (Claims 12 and 24). D.C. Del., 133 F.Supp. 648. The judgment was affirmed (per Biggs, C. J.), 3 Cir., 237 F.2d 594. The trial judge then appointed Irving Morris, Esq., a Master "to take and report an account of such damages" suffered by plaintiff (Philips) by reason of defendant's (Drew's) infringement. Facts and technical discussion of the patented process appear in the cited opinions.

The Master's report is confined to damages. Both sides have filed exceptions to his report.

### The Master's Report.[1, 1a]

The apposite statute is noted.[2] The Master recognized § 284 serves as a

1. Plaintiff's exceptions:
 (a) The Master computed damages on the basis of established royalty instead of basing damages on defendant's profits.
 (b) He changed his Draft Report by reducing an award of treble damages to double damages.
 (c) He failed to compute and increase an award of interest because of the willful infringement.

1a. Defendant's exceptions:
 (a) No exception to the finding of the base figure of damages of $28,307.47 but objection to the finding the infringement "was willful and deliberate, or at least grossly careless" and the doubling of the damages to $56,614.94.
 (b) The award of $20,724.65 to plaintiff for its attorney's fees.

 In support of the objections to double damages and attorneys fees, defendant makes specific objections:
 (1) Neither Judge Leahy nor Judge Biggs found willful infringement.
 (2) Defendant had a reasonable basis for a defense.
 (3) There was nothing improper in defendant's reduction of its prior art references from 24 items to 2.
 (4) Defendant's failure to justify its position in originally refusing a license offered by plaintiff has no import.
 (5) Inconsistencies in testimony of defendant's witnesses supported no inference of bad faith. [Cf. defendant's witnesses Ritter and Plumaker.]
 (6) Defendant's defenses of invalidity and non-infringement were far from insubstantial.

2. 35 U.S.C.A. § 284:
 "Upon finding for the claimant the court shall award damages adequate to

guide, but the decisional law has followed several paths: 1. reasonable royalty; 2. established royalty; 3. profits earned by an infringer. Plaintiff urged before the Master certain approaches under the various theories of damages.

Plaintiff argued it was entitled to defendant's entire gross profits because of commingling the processed product (covered by the patent) with other products sold by defendant and which made it impossible to apportion defendant's profits from its total sales of *all* its products. Moreover, it was argued, defendant's mark-ups also form the basis of estimating profits for awarding damages. In addition, treble damages were sought for willful infringement. But defendant argued plaintiff was entitled merely to a reasonable royalty, i. e., to be determined by the established royalty paid to plaintiff by its other outstanding (4) licensed users.

The Master recognized plaintiff's "compensation must not be less than a reasonable royalty for [defendant's] use of [plaintiff's] patent." [3] Where outstanding license agreements established a royalty, the Master said "it would be arbitrary to disregard [plaintiff's] own experience in the market place and to accept [plaintiff's] invitation to speculate about its damages over a range from \$358,082, to \$1,289,-096.87."[4, 4a] The Master found it significant that before the instant litigation, plaintiff had offered defendant a license agreement similar to those accepted by other users in the field. The Master said: "from the standpoint of compensating [plaintiff] as to its damages suffered as a result of [defendant's] infringement, one can ascertain its primary damages from [defendant's] refusal to accept a license from the royalty price (based upon grams of provitamin $D_3$) and the number of millions of international chick units of vitamin $D_3$ produced by [defendant] from [plaintiff's] patented process, after converting the vitamin $D_3$ units to grams of provitamin $D_3$ assuming a reasonably efficient process, since [defendant's] operation was admittedly inefficient, multiplying the result by a factor of 3." [5] Before the Master, defendant attacked such calculations because damages are recoverable only from the date of notice of infringement.[6] Defendant suggested further the established royalty rate (found in outstanding licenses) should be reduced because, if guilty, defendant infringed only one patent, whereas the established royalty in outstanding licenses

compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

"The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. July 19, 1952, c. 950, § 1, 66 Stat. 813."

3. "Where an established royalty for a license is proved, this is the best measure of the value of what was taken by the infringement". Faulkner v. Gibbs, 9 Cir., 199 F.2d 635, 638.

4. These figures are suggested base figures and do not include plaintiff's claim for treble damages based on willful infringement.

4a. Faulkner v. Gibbs, supra; and Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326, 334, certiorari denied Carrier Eng. Corp. v. Horvath, 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed. 486, rehearing denied 308 U.S. 636, 60 S.Ct. 171, 84 L.Ed. 529, were cited by the Master.

5. In a reasonably efficient process, one gram of provitamin $D_3$ produces 20 million international chick units of vitamin $D_3$. Testimony of defendant's expert Watkins, as to the multiplication factor to be used to compensate for the inefficiency of defendant's operation was "3" or "4". The Master adopted the lower of the two figures.

6. Defendant overlooked the fact the patent in suit was a process patent, so no notice was required. 35 U.S.C.A. § 287; U. S. Mitis Co. v. Carnegie Steel Co., C.C.Pa., 89 F. 206; Wagner v. Corn Products Refining Co., D.C.N.J., 28 F.2d 617.

was based upon two patents and six applications.[7] The Master concluded: "If established royalties are the measure, the infringer must pay them whether he infringed one patent or eight patents. [Defendant] having tortiously used the invention, seeks by its argument to place itself in a better position than [plaintiff's] licensees who lawfully used the invention."

Finally, defendant contended plaintiff's multiplication factor was erroneous in computing established royalties. Plumaker for defendant testified a. he had never isolated provitamin $D_3$; b. defendant's process was uneconomical in making dehydrocholesterol and converting it to vitamin $D_3$; c. the approximate efficiency of converting cholesterol into dehydrocholesterol was 15 to 40 to 50%; and, d, the overall process efficiency from cholesterol to vitamin $D_3$ was 10%. The Master found, however, Plumaker's testimony supported plaintiff's position; and Watkin's testimony for plaintiff likewise justified plaintiff's calculations.[8]

The Master found primary damages of $28,307.47 because he said they were: "based upon the reasonable royalty which [plaintiff] would have been entitled to receive and would have received from [defendant], had a license agreement with its established royalties been in effect between the parties during the period of infringement."

Plaintiff at all times sought treble damages, attorney's fees, interest and costs based upon willful or "grossly careless infringement." The Master was not free from doubt because of the statutory language, § 284, whether he had the power to increase damages. But, the Master concluded he had power to award more than primary or base damages if the facts would support such a conclusion.[9]

The Master's Report [10] then reads:

"The opinions of Chief Judge Leahy and Chief Judge Biggs and the record before me [5] leave no doubt that defendant's infringement in the instant case was willful, or, put in the best possible light to defendant, so grossly in disregard of the rights of plaintiff as to amount to willfulness.

"Before trial [defendant] relied on 24 items of prior art. At trial reliance was narrowed to two publications: a. the Wohl, and b. the Ziegler articles. No other ground of invalidity was pleaded nor was other evidence on any other ground introduced at trial. 133 F.Supp. 648, at page 650. Chief Judge Leahy found as a fact that defendant conceded

7. The record before the Master showed, however, the same royalties must be paid by licensees whether they operate under one or more of plaintiff's patents included in the outstanding licenses.

8. By stipulation the parties agreed plaintiff was not entitled to damages based upon use of vitamin $D_3$ purchased by defendant from a company which had in turn purchased it from an associated firm of plaintiff who was a licensee. Hence, such vitamin $D_3$ purchased by defendant was not taken into account in computing plaintiff's damages. The stipulation arose after the Master had in his Draft Report, which was first submitted to counsel, found a base damages of $40,321.41. After the stipulation such primary damages were reduced as shown in the text of the Master's Report. See, also, opinion on the order to be entered in the case at bar 188 F.Supp. 347.

9. Compare, Russell Box Co. v. Grant Paper Box Co., 1 Cir., 203 F.2d 177, 181,

certiorari denied 346 U.S. 821, 74 S.Ct. 37, 98 L.Ed. 347 rehearing denied 346 U.S. 905, 74 S.Ct. 216, 98 L.Ed. 404; Livesay Window Company v. Livesay Industries, 5 Cir., 251 F.2d 469, 475–476.

10. The Master's Report is quoted with his original footnotes. A stylistic change only has been made in the names of plaintiff and defendant.

"5. The record before me shows that defendant continued its infringement for months after Chief Judge Leahy's injunction order had issued on September 20, 1955. R 16–20. Although defendant posted a supersedeas bond protecting plaintiff as to damages sustained as a result of the appeal, I take defendant's unwillingness to give up that to which it was not entitled to even after its day in court as a meaningful additional circumstance entitled to some consideration in determining the issue of treble damages."

that 'Wohl was not concerned with the essential inventive step * * *.' Ibid. at page 651. As to the Ziegler article, Chief Judge Leahy found that it had been before the Patent Examiner and was overcome in the prosecution of the application on which the patent issued. Ibid. As the Court pointed out (Ibid.) defendant conceded that 'While Ziegler may have suggested a path in the forest, he never pointed it out, nor did he walk down it.' Chief Judge Leahy concluded: 'I do not believe a general synthetic organic chemist with no expertise in the chemistry of sterole, given Wohl and Ziegler (nothing else) could produce the substance resulting from the process of the patent by making use of general chemical information. At least no such chemist so testified.' Ibid. In every particular the opinion of the Circuit Court affirmed Chief Judge Leahy's findings and conclusions.

"Yet defendant's only bases for asserting the invalidity of the patent were the two articles by Wohl and Ziegler.

"If an infringer may take unto himself the invention of another without any bona fide or reasonable basis for so doing and run the risk only of having to pay at some future time a reasonable royalty for his use of invention, a premium would be placed upon the act of a wrongdoer, the rights of the inventor under his patent would become illusory,[6] and responsible people dealing in the patent field would be encouraged to disregard lawful property rights and participate in a lottery with the winning ticket stamped 'invalid'.

"Defendant's claim that it had 'good reason' to contest the patent and that it acted in 'good faith' (DB18) cannot be squared with the opinion of the District Court and the conclusion of the Circuit Court holding that: 'There is no question but that defendant has infringed [plaintiff's patent].' 237 F.2d at page 596. This is not a case where in good faith a reasonable doubt could have existed in the mind of the infringer. Where an alleged infringer takes an untenable position on the validity of the patent, and, at great expense and damage, the patent owner succeeds in establishing his claim in court, the infringer should bear not only the responsibility of making the patent owner whole, but also a penalty for his contumacious conduct. 35 U.S.C. § 284; Russell Box Co. v. Grant Paper Box Co., supra; Activated Sludge, Inc. v. Sanitary Dist. of Chicago, D.C.N.D.Ill.1946, 64 F.Supp. 25, 34-35, affirmed per curiam, 7 Cir., 1946, 157 F.2d 517; Livesay Window v. Livesay Industries, Inc., supra. In this case I believe the record as summarized in this report warrants doubling the damages and allowing plaintiff its counsel fees.

"An additional word of explanation is in order with respect to the doubling of damages. In a draft report submitted on July 31, 1959, to the parties pursuant to Rule 53(e) (5) [28 U.S.C.A.], I increased the damages by trebling them. I did so under my then erroneous view that defendant had persisted in infringing plaintiff's patent after Chief Judge Leahy issued a permanent injunction in September, 1955, which I thought would unquestionably make this case 'a classic example of a willful and wanton violation of a patent', i. e., continued infringement despite an order of the court. Because I considered violation of the Court's order in these circumstances so significant, I considered treble damages entirely warranted. The fact is, however, that by a stipulation in November, 1955, a supersedeas bond was entered having as one effect a postponement of the injunctive order until after a review and adjudication of the case by the Court of Appeals. Since I had ignored the November, 1955 stipulation in arriving at the tentative determination set forth in the draft report, I have reviewed the entire case carefully after receiving sug-

"6. The patent holder in the instant case was fortunately in a position financially to undertake vindication of its rights in the courts. An impecunious holder of a patent may well be unable to afford the expense attendant to defending his rights secured to him by his patent."

gestions from counsel (which, I add, have been most helpful), and I have concluded that the damages should not be increased by trebling them, but that, based on what unquestionably appears to me as defendant's lack of good faith in contesting the patent, the damages should be doubled. I add by way of explanation and not of excuse (I, of course, assume full responsibility for the error), that counsel who tried the case before Chief Judge Leahy and undoubtedly knew of the November, 1955, stipulation, both apparently overlooked the stipulation when they appeared before me. The Record before me reads (R 18):

> " 'Mr. H. C. Bierman: I am going to object to this line of examination. I don't think it is at all pertinent here. The fact that we ceased is the only fact that is pertinent.

> " 'Mr. Connolly: This has a very definite bearing, your Honor, on the question of damages, because the time to which this witness was referring was long after this company was under an injunction, and it bears directly on the wilfulness and the treble damages.

> " 'This company has been in this business violating the injunction for a long time after it was issued, so I submit it is most material to the issues before your Honor.

> " 'Mr. H. C. Bierman: The only thing material is the time when we ceased making, as far as this witness is concerned.'

"I conclude, therefore, that defendant should pay plaintiff damages in the amount of $56,614.94 (i. e. plaintiff's primary damages doubled), its reasonable attorneys fees, which I find to be in the sum of $19,150,[7] and its disbursements of $1574.65, interest from the respective dates when royalty payments would have been made by defendant had plaintiff taken a license such as those plaintiff had granted to others, and costs of the case and this proceeding.

"Hereto attached and made a part of this report are the specific Findings of Fact [11] and Conclusions of Law upon which this report is based.

"Irving Morris
"Special Master"

1. The final chapter of this litigation concerns damages. The most recent statement is contained in International Industries, Inc., v. Warren Petroleum Corp., 3 Cir., 248 F.2d 696, 699, where the Court discussed the close analogy between damages for a purloined trade secret and for patent infringement, and held damages are not what a plaintiff lost but rather "the benefits, profits, or advantage gained by the defendant."

Before 1946, 35 U.S.C.A. § 284 used the word "profits". The 1952 subsequent codified version [12] of the patent laws left this out. But, the effect of the elimination *was* considered by the Senate Committee on Patent,[13] when it stated: " * * * the bill would not preclude the recovery of profits as an element of general damages * * *." And cases since have held profits of an infringer are a proper factor in considering damages where other measures are not totally adequate.[14] Where the commercial value of a product is increased by the use of the patented process and in-

"7. The parties have stipulated that counsel for Philips has billed Philips $19,150 for services. See Stipulation filed October 13, 1959. Drew's agreement as to the fact of the amount of the billings was, of course, without prejudice to its position, vigorously asserted, that such an allowance is not warranted in this case."

11. Consideration of the findings of the Master may be found attached to this opinion, infra.

12. July 19, 1952, c. 950, § 1, 66 Stat. 813.

13. Report No. 1503, July 14, 1946, 1946 U.S. Congressional Service pp. 1386–1387.

14. National Multiweaving Company v. O'Keefe, D.C.Miss., 133 F.Supp. 151, 154; Laskowitz v. Marie Designer, Inc., S.D.Cal., 119 F.Supp. 541, 555; Graham v. Jeoffroy Mfg., 5 Cir., 253 F.2d 72.

infringement is present, profits are considered a relative element.[15] This Circuit in defining a reasonable royalty to be an established royalty, as the amount which an infringing party using another's patent must pay, did not exclude, I think, consideration of all other factors, including the tort-feasor's profits, in arriving at the patent owner's damages.[16] For example, the nature of the invention, its utility, its novelty over and advance in the art, and the extent of its use by the infringer, are entitled to judicial consideration.[17]

2. Damages may be measured by the defendant's gain or the plaintiff's loss. Yet, no matter how measured, it can never be less than a reasonable royalty—and, there must be the factor of the infringer's profits to be considered as one of the elements of measurement.[18] The factors selected by a Court for application must be determined in any particular case by the facts and circumstances involved, so, as a matter of fairness and equity the plaintiff receives his injunctive relief and sufficient compensation for the wrong done and, so, defendant may not digest and retain, but must disgorge, his illegal gains. And some Courts have not exercised meticulous care to avoid hardship on the infringer.[19] There should be no special rule indigenous to a person who commits a patent-tort from the liability of a defendant who takes your automobile, your business or your trust fund. In short, "damages" adequate to compensate for any particular infringement under § 284 should not be based solely on 1. established royalty; or, 2. reasonable royalty; or, 3. profits of an infringer. Cases may be found falling into each of these categories. But this should not be a congealed pattern for recovery, i. e., any particular theory of recovery applied to the exclusion of the remaining two theories of recovery. An enlarging complex of law has sprung from Article 1, Section 8 of the Constitution. This body of law, at least for the last quarter of a century, has been in a state of change. Concepts of invention, and all its allied incidents, (including recoverable damages, I think) present new and special problems, as suggested by one of the writers.[20]

15. Carborundum Co. v. Electric Smelting & Aluminum Co., 3 Cir., 203 F. 976, certiorari denied 231 U.S. 754, 34 S.Ct. 323, 58 L.Ed. 467; Faulkner v. Gibbs, 9 Cir., 199 F.2d 635.

16. See Randolph Laboratories, Inc. v. Specialties Development Corp., 3 Cir., 213 F.2d 873 (Maris, J.).

17. American Tel. & Tel. Co. v. Radio Audion Co., D.C.Del., 5 F.2d 535.

18. Wedge et al. v. Waynesboro Nurseries, Inc. et al., D.C.Del., 31 F.Supp. 638.

19. Filtex Corp. v. Amen Atiyeh, 9 Cir., 216 F.2d 443; Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326.

20. Recently it has been said by Chief Judge Biggs (Dynamics of the Patent System, 1960, pp. xv, xvii, xviii):

"Many years have passed since that real or apocryphal Patent Office Examiner resigned because he saw nothing left to invent and felt there was no future to his job. Today the attitude is exactly the opposite. * * * Like a rocket rolling out of orbit our patent system has become too ponderous and too complex to be easily controlled. * * * I do not agree with some of the remarks made about judges. The structure of our republican form of government is such that problems of litigation are solved slowly at best and we must expect many variations of views. * * * Patent litigation, like other litigation, has its own special problems and these are accentuated by the tediousness of the technical terminology with which patents invariably are associated. If we are to make patent litigation less complicated the courts must conscientiously consider the opinion of specialists in the field. However, I would remind the experts that their opinion as to the efficiency or inefficiency of the courts varied widely depending on whether they represented the plaintiff or the defendant. Indeed, the experts readily admitted this witty diversity. It is the court's duty to penetrate the art of advocacy. * * * Judges must endeavor to get to the heart of a problem by obtaining accurate facts applying the appropriate law, and dispensing justice as best they can to the skilled and unskilled advocate alike. They must always remain alert for distracting techniques intended to sway them one way or

General damages (at law or in equity) are compensatory for the thing taken or the injury sustained. Punitive damages have a specific purpose and meaning. But, the problem in each case is whether a particular plaintiff is entitled to the totality of "the benefits, profits, or advantage gained by the defendant." International Industries, Inc. v. Warren Petroleum Corp., supra.

3. One measure of damages in infringement cases is on an established royalty basis which is the royalty paid by others in an industry and which indicates a general acquiescence in the value of the invention. In contrast, if a reasonable royalty base is applied, this represents the amount one would pay for the use of the patent as a business proposition, after evaluating the novelty of the invention, its utility and advantages. Faulkner v. Gibbs, 9 Cir., 199 F.2d 635. A reasonable royalty is often higher than an established royalty for the latter is usually based upon agreements negotiated before the patented invention is broadly recognized and before the patent stands the test of judicial scrutiny. The lowest return for a measure of damages would be on the basis of an established royalty.

4. But, here, defendant's production records before the Master should be increased on a monetary basis to compensate for the admitted inefficiency of defendant's operations. When this is done, the testimony demonstrates that damages computed even on the basis of established royalties would be about $53,761.88. To take a reasonable royalty as a measure of damages, a figure of 10% of the sale price of defendant's vitamin D$_3$ was considered reasonable under the evidence before the Master.[21] The sales prices of vitamin D$_3$ are in the record. The statute itself provides awarded damages shall in no event be "less than a reasonable royalty". Since sales of defendant's products containing D$_3$ could be computed on the total sales figures of $3,580,824.63—10% of such figure would be $358,082 to form the basis of a reasonable royalty return.

5. Considering defendant's profits as a factor to arrive at a figure for plaintiff's damages, the record before the Master establishes an area between $685,818.90 and $1,289,096.87. The Master made no findings with respect to defendant's profits, however, because he was of the view it was unnecessary as he based plaintiff's award on an "established" or "reasonable" royalty base. But the evidence on defendant's profits as found in the record is not without interest. There was an accounting (The Richards and Ganly Report) which merits examination. Defendant's president so admitted.[22] The Report is based upon assumptions, conclusions and beliefs— unverified because of absence of defendant's records.[23] The spot-tests method was used.[24] In fact, only "spotty" records were available for the Report.[25] There was an absence of necessary records for computing costs and stating profits.[26] The Report was so inaccurate its authors would not certify it.[27] Because there apparently was an accounting confusion as to the type of vitamin units discussed, a significant 4 to 3 error was made in the total production fig-

the other. Even though the judges use the greatest artistry of which they are capable, it will not be necessary to consult prediction tables to enable us to say with assurance that one-half of the litigants will be happier with the results of judicial thinking and the other half will be unhappy."

21. Both the statute (§ 284) and the cases say testimony of an expert is admissible. See, International Vitamin Corp. v. E. R. Squibb & Sons, D.C.E.D.N.Y., 13 F.Supp. 129; Excel Auto Radiator Co. v. Bishop & Babcock Mfg. Co., D.C.Ohio, 123 F. Supp. 315, affirmed 6 Cir., 212 F.2d 586.

22. R. 476–78, 480, 497–99.

23. R. 123–25, 283, 284, 339–41, 328, 339, 368.

24. R. 125–26, 157, 158, 283, 293, 334, 448–50, 284, 374–75, 128.

25. R. 128, 166, 349.

26. R. 128, 130, 143, 281, 312, 313, 342–43, 357, 363–64, 445.

27. R. 141–42, 144, 296.

ures.[28] A check of the computations revealed arithmetical error.[29] Errors resulted from the way cost and expenses were constructed and allocated. For example, cost was taken for part of a year and then assumed appliable for the entire year and preceeding year without regard to actual cost and the shifting increase or decrease of cost.[30] Then percentage of costs was arbitrarily allocated from one year and applied to others.[31] Variations in both costs and sales were not considered.[32] As to certain cost and expense items no rates or figures were given—only arbitrary allocations were made.[33] No cost or expense item of vitamin $D_3$ was segregated by product—vitamin $D_3$ was simply assigned a share of cost and expense regardless whether this product was responsible for any portion of that cost or expense.[34] Even administrative expense was not segregated by division.[35] In sum, nowhere in the Report is it shown vitamin $D_3$ was responsible for any of the cost or expense attributed to it.[36]

6. Manifestly the basic theory of the accounting Report (allocation of expenses and costs on the basis of dollar volume of sales) lacks probative value since it shows no portion of costs and expenses attributable to vitamin $D_3$. But the Report cannot exculpate defendant for its infringement for 8 years, neither can it be tossed in the judicial waste basket, for it does show for that period sales of vitamin $D_3$ products amounting to $3,-580,824.63. The gross profits of defendant's sales of products containing vitamin $D_3$ are set forth in the record. For the purposes of this case these figures of defendant's own selection will be accepted for the finding of an award to go to plaintiff.

■ 7. One accounting expert was of the opinion there were several methods of computing defendant's profits other than the fictitious reconstruction and allocation of costs used by defendant. An acceptable method would show profits on defendant's sales of its product *without* vitamin $D_3$ as compared with profits from sales of the same products *with added* vitamin $D_3$.[36a] Sales of vitamin $D_3$ concentrate alone should have been shown.[37, 37a] But none of this evidence was forthcoming from defendant. In fact, defendant's president could not explain why defendant stopped keeping records after the suit at bar was started but records were kept after judgment was given for plaintiff.[38] Defendant was a "one-man" company. Yet its president paid no attention to the instant litigation,[39] never attempted to ascertain if his company was infringing,[40] was never advised when the Court's injunction was issued.[41]

■ There is available, however, another method of computing defendant's profits e. g., defendant's mark-up of products using vitamin $D_3$. Defendant's sales records show mark-ups from 22% to 50%

28. R. 149–50.

29. R. 317–18.

30. R. 136, 286.

31. R. 286–87.

32. R. 288.

33. R. 292.

34. R. 294–95, 319.

35. R. 296.

36. R. 299–300.

36a. R. 301.

37. R. 299.

37a. Where defendant carelessly construed the patent as invalid and failed to cooperate in preserving records, an allowance of 1½ times a reasonable royalty, together with counsel fees, was allowed. Russell Box Co. v. Grant Paper Box Co., 1 Cir., 203 F.2d 177, certiorari denied 346 U.S. 821, 74 S.Ct. 37, 98 L.Ed. 347.

38. R. 478–79.

39. R. 484.

40. R. 490.

41. R. 506. Even where an infringer acts on advice of counsel it does not avoid increased liability. Duplate Corp. v. Triplex Safety Glass Co., 3 Cir., 81 F.2d 352, modified on other grounds 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274; See, too, Randolph Laboratories Inc., v. Specialities Development Corp., 3 Cir., 213 F.2d 873.

or an average of 36%. In addition, one expert showed mark-ups in the vitamin field of from 60% to 150%.[42] Dollar volume of sales were shown and with a fair mark-up of only 36% there would result a profit (involving $D_3$ products) of $1,289,096.87. All this is on the basis of defendant's own records. Where infringement is palpable, the injunctive process issues, and when the established royalty measure of damages is inadequate, a proper measure of damages includes a consideration of profits (not, however, a total award of the profits) as one of the elements gained by the defendant's illegal use of the patent.[43]

The expert testimony shows a reasonable royalty to be 10% Then there is the Richards-Ganly Report which shows sales of products containing $D_3$ of $3,580,824.63. Defendant's president stated these sales resulted because of the vitamin $D_3$.[44] Aside from defendant's substantial profits, a reasonable royalty, on the last figures noted, would be $358,082. The award by the Master of merely $28,307.47 is obviously "less than a reasonable royalty" and could be said to violate the statutory minimum.

 8. Much consideration was given by the parties to whether the obvious infringement was willful. It apparently worried the Master, too. He first found the infringement willful enough to treble the base-damages he arrived at.

Then after further presentation by the parties he cut it to double damages. The record makes available a narrative which proves the defendant's infringement was far from accidental. Defendant's production manager admitted use of the patented process since 1948 [45] when defendant began its large commercial use of plaintiff's patent [46] which had issued only a month preceding.[47] This was no chance use of plaintiff's process: patent experts, in fact, put defendant's process in operation.[48] In 1950 defendant was offered a license under the patent in suit, the same licensed patent as other companies in the industry were operating under.[49] An analysis of defendant's behavior pattern of infringement over the years, post and ante suit, offers a choice where reasonable judges could differ on whether the infringement was willful enough to support treble or double damages. In short, decision, in the instant case under the facts, is well within the area of legitimate difference of opinion as to whether plaintiff should have its base-damages multiplied. But, this compensatory technique selected by the Master is not wholly required. Moreover, any recovery based on established royalties is rejected.[50] The statute itself (§ 284) provides for nothing "less than a reasonable royalty for the use made on the invention by the infringer, together with interest and costs" and the "court may receive expert testimony as an aid

42. R. 204.

43. National Multiweaving Company v. O'Keefe, supra; Laskowitz v. Marie Designer, Inc., supra; Graham v. Jeoffroy Mfg. Co., supra; Sel-O-Rak Corp. v. Henry Hanger & Display Fixtures Corp., D.C.S.D.Fla., 159 F.Supp. 769, affirmed 5 Cir., 270 F.2d 635; Wedge et al. v. Waynesboro Nurseries, Inc., et al., D.C. Del., 31 F.Supp. 638.

 Defendant cites Widenski v. Shapiro, Gernstein & Co., 1 Cir., 147 F.2d 909, 911. But it merely holds the reasonable royalty measure applies only where the harmed plaintiff "cannot prove either their actual damages or the defendant's actual profits with a means to escape the hollow victory of an award of purely nominal damages." (Emphasis supplied.)

44. R. 486.

45. R. 6.

46. R. 7.

47. R. 356.

48. R. 6, 16.

49. R. 184-90.

50. The Master based damages on established royalties ($28,307.47) which, under the particular facts of this case, he treated as the same as reasonable royalties. It is a fact of economic life that an open infringement tends to reduce a patentee's fees from its subsequent licensees who must meet the infringer's competition, and such infringement deters potential licensees from taking a license.

to the determination of damages or of what royalty would be reasonable under the circumstances." A meticulous calculation of a fair or reasonable patent royalty is for all practical purposes a physical impossibility. The field of economics —where a reasonable royalty lies—is not subject to the uncanny precision of mathematical sciences such as astronomy and electronics, since, unfortunately, business men do not at all times behave like heavenly bodies or charged particles. To strive for such precision would serve only to defeat the judicial purpose. But, here, we have tangible tools to work with. As stated above, there is evidence of a reasonable royalty of 10% and the Richards-Ganly Report of total sales or products containing vitamin $D_3$ shows \$3,580,824.-63.[51] A reasonable royalty, taking all other factors and defendant's profits into consideration, would therefore be \$358,-082. Anything less than this minimum would be a violation of the statute for recovery. Such damages are awarded.

█ 9. The Master's allowance of attorneys fees for plaintiff are approved. The entire record of the case at bar demonstrates it was "exceptional" even in the semantic sense.[52] The Master provided for the computation of interest, as provided for by the statute, in his Conclusion of Law No. 11. There should be no difficulty for counsel to arrive at an acceptable figure, to be included in the monetary judgment that is to be entered. Damages, as stated, interest, attorneys fees and costs are allowed. Each party shall be responsible for one-half the allowance made to the Master.

Submit order.

### Master's Findings of Fact

The results of an examination of the Record support the findings of fact of the Master.

(A) Findings of fact Nos. 1, 2, 4, 5, 6, 9 are supported by the Record. Defendant did not object to these. They are adopted.

(B) Finding 3: defendant objects. The finding is supported by the Record. The finding is adopted.

(C) Finding 7: both plaintiff and defendant agree the figure of \$40,321.41, there stated, should be \$28,307.47. This correction is adopted.

(D) Finding 8: defendant objects. The finding is supported by the Record. Defendant's objections are argumentative in nature. The complaint by defendant is, at bottom, the Master gives a different emphasis to the facts found in the evidence from that which the defendant would give. Weighing the inference-fact-conclusion of the Master and considering it within the range of reasonable limits, the finding should stand, and it is adopted.

(E) Finding 10: defendant objects. Same comment, here, as made in (D) supra, and also diluting the fact-inference of bad faith, the finding is adopted.

(F) Finding 11: defendant objects. Same comment, here, as made in (D) and (E), supra. The finding is adopted.

(G) Finding 12: defendant objects. The findings, here, are supported by the Record. Defendant argues these facts are immaterial and irrelevant to the question of damages. I disagree. The Master's consideration of these facts was not erroneous. The finding is adopted.

### The Court's Additional Findings of Fact

For a proper decision in the case at bar it is necessary to make additional findings of fact. These are supported in the record before the Master; and they sustain the decision, using a reasonable roy-

---

51. Defendant's president, Mr. Drew, testified these sales resulted solely because of the additive vitamin $D_3$. See R. 486.

52. Livesay Window Co. v. Livesay Industries, Inc., 5 Cir., 251 F.2d 469, 476, held a case "exceptional" where from the outset, as in the present case, defendant had taken "a completely untenable

position on the validity of the patent." The cases on allowance of attorneys fees could be multiplied by the hundreds both plus and minus depending on the facts of each case.

Most recent announcement: Hardinge Company, Incorporated v. Jones & Laughlin Steel Corp., 3 Cir., 275 F.2d 37 (writ applied for May 6, 1960).

alty measure after considering defendant's profits, plaintiff has proven damages, as stated in the foregoing opinion, of $358,082.

13. Plaintiff's president Drew testified costs were so intermingled they could not be segregated.[53]

14. Defendant's Plumaker testified defendant never isolated provitamin $D_3$ since defendant's process (using plaintiff's patent) of making vitamin $D_3$ was a continuous one.[54] Because of defendant's lack of records, failure to segregate costs, failure to keep any process cost records, it is not possible to allocate costs or profits to any particular step in the manufacture of vitamin $D_3$.[55] Plumaker never tried to compute the cost of making provitamin $D_3$,[56] and defendant's Preusch had trouble finding vitamin $D_3$ costs; he readily admitted defendant kept no cost records in its Vitamin Division and made no effort to segregate costs.[57] Shanks corroborated this testimony.[58] Defendant's president Drew agreed costs were so intermingled they could not be segregated.[59]

15. Preusch gave as one reason for failure to keep cost records on vitamin $D_3$ and failure to segregate expenses to this product was that this product was only a small part of defendant's business.[60] Between 1948 and 1956 net annual sales of vitamin $D_3$ varied between $234,050.10 and $541,579.66 while defendant's entire annual sales varied from $44,516,792 to $88,380,652.[61]

16. Most of the products which contained vitamin $D_3$ were also sold by defendant without the vitamin $D_3$.[62]

17. Defendant's profits on its sales of products containing vitamin $D_3$ were $685,818.90.[63]

18. Watkins of plaintiff's licensing department and with broad experience in this field [64] testified a royalty of 10% of the sale price of defendant's vitamin $D_3$ is reasonable.[65]

19. Sale prices of vitamin $D_3$ are described and found in the evidence [66] and the exhibits. Applying a 10% royalty rate, using defendant's own prices, to the number of units of vitamin $D_3$, in fact, sold by defendant a reasonable royalty results.

20. Since defendant's sales of products containing $D_3$ resulted solely because of the $D_3$, as even defendant's president Drew testified,[67] the reasonable royalty, in the light of defendant's heavy profits, should be computed on a total sales figure of $3,580,824.63, in an award of damages for plaintiff in the amount of $358,082.

53. R. 483.

54. R. 32.

55. R. 310, 326. (Where profits have been so commingled a plaintiff is entitled to a defendant's entire profits. The leading case on a defendant's burden of proof, as well as an apportionment of profits and confusion of profits is Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222. The later case of Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F. 2d 163, 164 summarizes the rule. See, too, Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326.

56. R. 435.

57. R. 133, 160.

58. R. 294–296.

59. R. 483.

60. R. 366, 144–45.

61. PA 8 and 2.

62. R. 65–67, 88, 486.

63. PX 8.

64. R. 180, 200, 221, 239, 247.

65. R. 210, 211, 261.

66. R. 228–29.

67. R. 486.